In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-3440

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENT G. BERHEIDE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 CR 22—**John C. Shabaz**, *Judge.*

ARGUED MAY 13, 2005—DECIDED AUGUST 30, 2005

Before CUDAHY, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Pursuant to a plea agreement, Kent G. Berheide pled guilty to one count of making a false statement and overvaluing security to influence Peoples State Bank to defer action on the replevin of collateral for a loan in violation of 18 U.S.C. § 1014.[1]

---

[1] Kent Berheide and his wife Lisa Berheide were originally charged in an indictment alleging various fraudulent acts. Kent
(continued...)

Prior to sentencing, the district court and the parties became aware of this court's decision in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004). To address the potential constitutional problems with the sentencing guidelines, the government and Berheide entered into an addendum to the plea agreement in which they agreed that "the United States Sentencing Guidelines are applicable in their entirety to this case, with the following exception. Namely, the defendant consents to judicial fact finding of all sentencing adjustments, but reserves the right to contend at sentencing that the Court should make its findings of fact beyond a reasonable doubt." The district court accepted the supplemented plea agreement. Then, using a "beyond a reasonable doubt" standard, the court made factual findings regarding guidelines calculations and sentenced Berheide to 37 months' imprisonment.

On appeal, Berheide argues that the intended loss figure used to compute his sentence was incorrect, and that the guidelines range was improperly calculated. We agree. We order the sentence vacated, and the case will be remanded to the district court for resentencing.

## I. Background

Kent and Lisa Berheide owned and operated KB Supply, Inc., a small business in West Salem, Wisconsin. In March 1998, Kent Berheide contacted Peoples State Bank ("the bank") in Wausau, Wisconsin, and requested a loan that would be used to purchase B and R Home Center, located in Wausau and Antigo, Wisconsin. A loan was secured from

---

[1] (...continued)
Berheide was charged with nine counts and his wife with seven. Lisa Berheide pled guilty to concealing $8685 in state and federal income tax refunds from the bankruptcy court, the trustee, and their creditors. She was sentenced to four months' imprisonment.

the bank and on May 13, 1998, Kent and Lisa Berheide signed a promissory note for a $550,000 revolving line of credit. They also signed a personal guarantee and a general business security agreement. The bank disbursed the full amount of the $550,000 loan to the Berheides.[2] On the same day, Kent Berheide purchased B and R Home Center.

Approximately ten months later, in March 1999, the bank performed a field audit on KB Supply, Inc., because it was having difficulty obtaining loan payments. The audit disclosed that the inventory levels and accounts receivables were lower than Berheide had represented.

In late May 1999, the KB Supply store in Wausau (apparently the former B and R Home Center) closed. Shortly thereafter, the bank began a replevin action against KB Supply, Inc., to liquidate collateral for the loan. Kent Berheide and his lawyer asked the bank to postpone the replevin action so that the business could be sold as a going concern.

On July 16, 1999, the bank entered into a forbearance agreement with KB Supply, Inc., whereby the bank gave KB Supply until August 15 to produce documentation of a sale. In return, KB Supply gave the bank a security interest in various vehicles, and Kent Berheide gave the bank a security interest in KB Properties, a partnership that owned real estate located in Antigo and West Salem, Wisconsin.

The bank then filed mortgages on the real estate holdings of KB Properties. The bank soon learned, however, that the day before providing the security interest in the real estate, Berheide had transferred ownership in the West Salem property to someone else—real estate the bank believed to

---

[2]  KB Supply, Inc., received a $200,000 loan from the bank on May 13 as well.

be worth $200,000. In early August 1999, bank representatives went to the KB Supply store in West Salem to repossess collateral, but they found only three rolls of carpeting.

At that time, Kent Berheide owed the bank a loan balance of $521,231.87.[3] This loan balance figure was used in Berheide's presentence report to compute the intended loss that determined the sentencing guidelines range. The $521,231.87 was added to other losses totaling $194,073.99.[4] The district court then found beyond a reasonable doubt that "the intended loss of $715,305.86 was more than 500 but less than the 800 . . . ." (Sent. Tr. at 26.) Having thus determined that the intended loss fell between $500,000 and $800,000, the court enhanced Berheide's sentence by 10 levels, calculated a guidelines range of 30-37 months, and imposed a 37-month sentence.

Berheide argues that the $521,231.87 figure was improperly included in the intended loss calculation. It is undisputed that he legitimately obtained the $550,000 loan from the bank in May 1998. He admits that more than a year later, in July 1999, he gave the bank a mortgage on property he no longer owned in order to induce the bank to delay its replevin action. However, he argues that with regard to the fraudulently obtained forbearance agreement, the government did not prove that the bank suffered any real loss in the three weeks it delayed in pursuing its replevin action. In order to prove that a $521,231.87 loss occurred, the government would have had to show that $521,231.87

---

[3] The ultimate actual loss suffered by the bank, after taking into account what it received as a creditor in bankruptcy, was $462,384.12.

[4] This figure includes a loan balance of $140,000 that was owed to another bank, and funds concealed from the bankruptcy trustee which included $8685 in income tax refunds, $37,888.99 in inherited property, and a camper worth more than $7500.

in assets existed at the time of the July forbearance agreement and then entirely disappeared by early August when the bank sought to recover its collateral.

Berheide contends that his conduct in fraudulently obtaining the forbearance agreement, while criminal, should not be punished as if he had fraudulently obtained the $550,000 loan itself. There is no doubt that he breached the May 1998 loan agreement by not paying off the debt, but breach of contract is not a crime. What we must determine here is the amount of loss for which he is criminally liable, remembering that the wrongful conduct charged was that he fraudulently secured the July 1999 forbearance agreement.

## II. Analysis

"The district court's assessment of the amount of loss is a factual finding, which we will not disturb unless it is clearly erroneous." *United States v. Lane*, 323 F.3d 568, 585 (7th Cir. 2003) (citation omitted). However, the meaning of "loss" is a legal question that we review *de novo*. *See id.*

Berheide was sentenced according to U.S.S.G. § 2F1.1(b)(1)(K), which was in effect at the time of his offense. That section required an increase of 10 levels for a loss of more than $500,000 but less than $800,000. The application notes tell us that the punishment for fraud is based on either the actual or intended loss, whichever is greater. *See* U.S.S.G. § 2F1.1, Application Note 7 (Nov. 1998).

There is no doubt that the loan balance was an *easy* figure to latch onto in computing the intended loss to the bank, but the real question is whether the government proved beyond a reasonable doubt that the entire loan balance was the *correct* loss figure. The government called one witness at sentencing who presented documents and testimony

relating only to the amount of money that the bank was owed in July 1999. This testimony would have been relevant if Berheide had fraudulently obtained the May 1998, $550,000 loan. He did not. There was simply no evidence showing that the bank could have collected $521,231.87 in collateral on the day that the July 1999 forbearance agreement was signed. The government presented no evidence that the bank suffered any actual loss by delaying its collection actions for three weeks following the signing of the July 16, 1999, forbearance agreement.

Even though the government did not prove any actual loss, we must still consider the intended loss. "[T]he relevant understanding of values for purposes of determining intended loss under the sentencing guidelines is that of the criminal, not that of the victim." *United States v. Fearman*, 297 F.3d 660, 661 (7th Cir. 2002). We must determine how much loss, if any, Berheide intended the bank to suffer on July 16, 1999, the date of the fraudulently induced forbearance agreement. *See id.* at 662.

Berheide obviously had a better idea of the value of his business than did the bank on the day he signed the forbearance agreement. If he knew that the business assets were virtually non-existent on July 16, "it is difficult to see how [the bank] was hurt by the delay" in collecting the collateral. *See id.* at 661. For example, if the bank would have recovered three rolls of carpet and miscellaneous fixtures on July 16, and did recover three rolls of carpet and miscellaneous fixtures in early August, the actual and intended loss is $0.

It does seem odd that Berheide would commit criminal fraud in signing the forbearance agreement if there were minimal assets for the bank to collect. But it is possible that he truly believed he would be able to find a buyer for the business. *Cf. id.* at 662 (explaining that although it was difficult to determine what benefit the defendant thought

she might gain from the fraud, an intended loss "is not a realistically expectable loss . . . [but,] it must exist at least in the defendant's mind.") (internal citation omitted). Selling the business as a going concern may have allowed Berheide to pay off his loans and might have even kept him out of bankruptcy. While it is true that finding a buyer for the failing business was likely an unrealistic hope, it appears that Berheide believed it possible. Nevertheless, there is no basis for a finding that Berheide believed his business to be worth $521,231.87 on July 16—especially considering the fact that in early August, nothing remained except for three rolls of carpeting—and therefore, the intended loss was calculated improperly.

Berheide argues that if the loss attributed to him of $715,305.86 is reduced by $521,231.87, the total loss based on relevant conduct will be $194,073.99. Accepting the $194,073.99 figure as the loss amount would increase his base offense level by 7 (instead of 10), and lead to a calculated guidelines range of 21-27 months. *See* U.S.S.G. § 2F1.1(b)(1)(H) (Nov. 1998). It is difficult, however, to determine the appropriate loss figure from the current record. It seems clear, for example, that Berheide intended the bank to suffer the loss of the West Salem property, but was the real estate worth $200,000 as the bank speculated? Also, if the government can produce evidence that Berheide disposed of secured assets between July 16 and early August, the value of those assets would be properly included in the intended loss figure and considered in Berheide's resentencing. So, although the record is incomplete and we do not know what the intended loss figure should be, we are certain that it should not include the $521,231.87 loan balance.

The district court in this case correctly predicted the demise of the mandatory sentencing guidelines. *See United States v. Booker*, 125 S. Ct. 738 (2005). Judge Shabaz imposed a sentence treating the guidelines as mandatory,

as agreed to by Berheide, but also stated that "in the event the United States guidelines are ruled unconstitutional the Court will also impose an alternative sentence consistent with the provisions of Section 3553(a) and use the guidelines calculated by the Probation Office as advisory and a reliable indicator in determining the appropriate sentence within the statutory limits of conviction." (Sent. Tr. at 22.) The court imposed a 37-month sentence under both the mandatory and advisory guidelines schemes.

By selecting both a mandatory sentence and a "nonguidelines alternative sentence," the district court followed our directive in *Booker*, 375 F.3d at 515. Typically, we would now review the discretionary sentence for reasonableness. *See Booker*, 125 S. Ct. at 765. However, in this case, the government and Berheide entered into a plea agreement—accepted by the court—in which Berheide agreed "that the United States Sentencing Guidelines are applicable in their entirety[.]" It is well established that a plea agreement is treated as a contract. *See, e.g., United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005). Here, Berheide bargained for the right to be sentenced under the mandatory guidelines regime. He waived his right to any possible sentencing benefit that *Booker* might have afforded and is entitled to a properly calculated sentence under the mandatory guidelines.

Although we must defer to the district court's findings of fact unless they are clearly erroneous, here we have a "definite and firm conviction that a mistake has been made." *United States v. Brierton*, 165 F.3d 1133, 1137 (7th Cir. 1999). Because the court selected a guidelines range by relying on a clearly erroneous factual finding, "we are obliged to remand for resentencing unless, reviewing the record as a whole, we can conclude that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *United States v. Hollis*, 230 F.3d 955, 958 (7th Cir. 2000) (citing *Williams v.*

*United States*, 503 U.S. 193, 201-04 (1992)).

It is apparent that the error made by the district court in calculating the intended loss figure did affect the sentence imposed. Therefore, we must vacate the sentence and remand for resentencing under the sentencing guidelines, as mandatory. *See id.*

### III.  Conclusion

For the reasons stated herein, we VACATE Berheide's sentence and REMAND to the district court for resentencing consistent with this opinion.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—8-30-05m