In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1074

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN MIDDLEBROOK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 06 CR 50005—**Philip G. Reinhard**, *Judge*.

ARGUED DECEMBER 12, 2008—DECIDED JANUARY 22, 2009

Before CUDAHY, FLAUM, and WOOD, *Circuit Judges*.

FLAUM, *Circuit Judge*. A jury convicted John Middle-
brook of bankruptcy fraud, making a false declaration in
a bankruptcy proceeding, making a false oath in a bank-
ruptcy proceeding, and fraudulent concealment of prop-
erty. The district court sentenced Middlebrook to 32
months' imprisonment. The court also imposed a restitu-
tion obligation on Middlebrook in the amount of
$1,590,190. On appeal, Middlebrook challenges the cal-

culation of loss under the sentencing guidelines, and he challenges the restitution amount. He asks that we remand the case for resentencing, and that we reduce his restitution obligation. For the following reasons, we affirm the district court's sentence and its restitution order.

## I. Background

Middlebrook was president and 85% owner of Federal Telecom, a telecommunications products manufacturer that operated out of Hebron, Illinois. Middlebrook resided in Florida and conducted his Federal Telecom work from home.

During his tenure at Federal Telecom, Middlebrook took personal loans from the company. Over time, Middlebrook repaid portions of these loans, but he also took out additional loans from the company. That debt was reflected on Federal Telecom financial documents in various ways, including "Shareholder Note Receivable," "Officers/ Shareholders," "Notes Receivable, Stockholders," and "Officer's Notes." As late as June 2001, the debt was listed as a $1,135,502 asset on a Federal Telecom financial statement. Middlebrook also listed that debt as a liability on his personal financial statements, and he paid interest on the debt to Federal Telecom. Middlebrook's personal financial statement as of March 31, 2001 stated he had a net worth of $2,669,255 after taking into account his liability for the shareholder note.

On August 24, 2001, Federal Telecom filed for Chapter 11 bankruptcy protection in the Northern District of Illinois, Western Division. On motion of its largest creditor, the

bankruptcy court converted Federal Telecom's Chapter 11 reorganization to a Chapter 7 liquidation on October 31, 2001.

On October 3, 2001, Federal Telecom filed in bankruptcy court its original schedules of assets and liabilities and its statement of financial affairs. Middlebrook verified these documents under penalty of perjury. Yet neither the schedules nor the statement of financial affairs listed any information about the debt that Middlebrook owed to Federal Telecom.

A bankruptcy "341 hearing" took place on October 24, 2001. Middlebrook swore at that hearing that he had prepared the schedules of assets and liabilities and the statement of financial affairs that were filed in the bankruptcy case. At the hearing, Middlebrook was questioned extensively about the shareholder note receivable. He denied he owed anything to Federal Telecom. He asserted that the receivables were, in fact, shareholder equity but were listed as assets because they represented "deferred income." Middlebrook asserted that his handling of the shareholder note receivable had been consistent with the advice of Federal Telecom's accountants. He further asserted that the accountants had told him that he could retire the loans either by repayment to Federal Telecom or by reporting the loan amount as income on his tax return. He indicated he would be reporting the amount of the Federal Telecom shareholder note receivable on his 2001 income tax return, but he never did so.

Question 21 on the statement of financial affairs required Federal Telecom to "list all withdrawals or dis-

tributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during the one year immediately preceding the commencement of this case." As to Middlebrook, Federal Telecom's answer stated that he had received $503,866 in distributions during the twelve months preceding the bankruptcy filing. In fact, the financial records of Federal Telecom show that Federal Telecom distributed about $948,000 to Middlebrook during that period.

In early 2002, Middlebrook received a post-bankruptcy transfer of $9,688 as a refund on an insurance premium that Federal Telecom had prepaid. Rather than turning these funds over to the bankruptcy trustee, Middlebrook deposited them in his own account. He made this transfer to himself despite having twice testified in bankruptcy proceedings that he expected the refund to go to Federal Telecom.

On April 15, 2003, the Chapter 7 bankruptcy trustee filed an adversary action against Middlebrook, his wife, and Federal Telecom. The basis for the proceeding was to avoid fraudulent transfers and to obtain a judgment for indebtedness. The trustee obtained a default judgment for $1,639,368.00. That figure represented the amount of the note ($1,135,502) and the amount of pre-bankruptcy distributions that Middlebrook disclosed ($503,866). The judgment did not include the roughly $445,000 of additional distributions that Middlebrook concealed by omitting them from the statement of financial affairs. The bankruptcy trustee made no recovery on the judgment.

Federal prosecutors subsequently brought a criminal case against Middlebrook. They originally charged Middlebrook with ten counts relating to bankruptcy fraud. On defendant's motion, the district court consolidated the case into seven counts: four counts of bankruptcy fraud, two in violation of 18 U.S.C. § 157(2) and two in violation of 18 U.S.C. § 157(3); one count of making a false declaration in bankruptcy in violation of 18 U.S.C. § 152(3); one count of making a false oath in bankruptcy in violation of 18 U.S.C. § 152(2); and one count of fraudulent concealment of property in violation of 18 U.S.C. § 152(7). The case went to trial on September 10, 2007. The jury found Middlebrook guilty on all seven counts.

The case proceeded to sentencing. The pre-sentence report (PSR) concluded that Middlebrook's total offense level was 28. The base offense level was 6. Section 2B1.1(b)(8)(B) required a 2 level upward adjustment because the offense occurred in a bankruptcy proceeding. The PSR included another 4 level upward adjustment under § 2B1.1(b)(2)(B) because there were 50 or more victims (the creditors). Finally, the PSR included an enhancement of 16 levels for the approximately $1.6 million loss (comprised of the unpaid note and the excessive distributions) under § 2B1.1(b)(1)(I). Since Middlebrook had no criminal history, his sentencing range would be 78 to 97 months. The government recommended the same loss amount in restitution. The PSR also indicated that, at that time, Middlebrook had a negative net worth in excess of $5 million.

Prior to Middlebrook's December 19, 2007 sentencing, he objected to the PSR's sentencing and restitution recom-

mendations. Middlebrook argued that, for sentencing purposes, the loss amount should not include the amount of the shareholder note because he had not sought to discharge the shareholder note in Federal Telecom's bankruptcy. He cited *United States v. Mutuc*, 349 F.3d 930 (7th Cir. 2003) and *United States v. Holland*, 160 F.3d 377 (7th Cir. 1998) to argue that in the Seventh Circuit "the proper loss calculation in bankruptcy fraud cases is the amount of the debt that the defendant sought to discharge in bankruptcy." *Mutuc*, 349 F.3d at 936. Middlebrook argued that the proper loss amount was more than $400,000 but less than $1 million. With that loss amount, a 14 level enhancement would be appropriate rather than the 16 level enhancement recommended in the PSR, for an adjusted total offense level of 26. That calculation would reduce the advisory sentencing range.

Middlebrook's objection to the PSR also included a request for a downward variance from the advisory sentencing range. He sought a sentence of 24 months. He argued that he deserved this downward variance because his goal of reorganizing Federal Telecom through Chapter 11 was laudable, and because he lacked a criminal history and represented a low risk for recidivism.

At sentencing, the district court heard Middlebrook's arguments, but it decided to include the amount of the note with the undisclosed executive compensation in making the guideline calculations. The district court described the amount of the note as the harm that Middlebrook intended by his non-disclosure of the note. The district court agreed with the offense level calcula-

tions in the PSR and determined that the offense level was 28 and the guideline range was 78 to 97 months. But the district court expressed a belief that the loss was not as great a factor as it could have been:

> [S]imilar sentences ought to be imposed for defendants convicted of similar offenses with similar criminal histories. Financial crimes, on the other hand are pretty diverse. And so, looking at the loss, which is really what generates the greater amount of points here, and try to impose a uniform sentence, it just isn't as great a factor as it would be in the traditional drug sale case.

> There's a great deal of difference in the types of financial crimes that I have seen, and I've seen a couple that related to bankruptcy, and each one is different. So, what I am saying is that that factor, that is, the guidelines, is not a great—it's one factor, but even in this case, it's not as significant as it might be in other cases.

Given this view of the loss amount, and taking into account Middlebrook's lack of prior criminal record and the district court's belief that he was unlikely to recidivate, the court deviated downward from the 78 month low end of the advisory guideline range to a sentence of 32 months. In imposing the 32 month sentence, the court stated: "I will make this statement, that even if I calculated the guidelines incorrectly and even if I were to accept the position of the defendant, that would be my same sentence. I have felt that . . . that's the appropriate sentence." The court then imposed a restitution obligation of $1,590,190. This figure

consisted of the ledger amount of the note ($1,135,502), the undisclosed compensation ($445,000), and the insurance refund ($9,688). This timely appeal followed.

## II.  Analysis

On appeal, Middlebrook argues that because the non-disclosure of the shareholder note did not cause actual or intended loss, this case should be remanded for resentencing. He argues that the non-disclosure of the note did not cause actual loss because the creditors would not have recovered any additional funds had the note been recorded on the bankruptcy schedules, because Middlebrook did not have the means to repay any judgment. He argues that there was no intended loss because he knew he was unable to pay any of the shareholder note to Federal Telecom, and therefore he did not intend to deprive the bankruptcy estate of anything of monetary value. Had the note been disclosed on the schedules, he argues, the creditors would have been entitled to a worthless judgment.

Middlebrook also argues that the district court's order of restitution was erroneous. He argues that the district court did not base its restitution order on the actual loss suffered by the creditors as a result of the fraud.

### A.  Guideline loss calculation

With regard to Middlebrook's sentencing argument, we note that he advances an argument on appeal that is

different from the argument that he presented at the district court during sentencing. Below he argued that "the proper loss calculation in bankruptcy fraud cases is the amount of the debt that the defendant sought to discharge in bankruptcy." On appeal, he asserts that the district court erred in including the full value of the shareholder note in the guideline loss amount because the non-disclosure of the note did not cause actual or intended loss. The government contends that this argument, not having been raised below, is forfeited. Thus, the government contends, we should review the sentencing loss calculation for plain error.

Middlebrook responds that he preserved the argument. He argues that below he merely presented an alternative theory as to why the amount of the note should not be included, but that the court and the government were sufficiently alerted that Middlebrook was challenging the inclusion of the shareholder note in the loss calculations based on his subjective intent. He cites *United States v. Lane*, 323 F.3d 568 (7th Cir. 2003) to argue that we have "allowed objections raised below that are different from those raised on appeal."

In *Lane*, defendant Lane argued that the district court improperly allowed the government to present evidence relating to Lane's indebtedness unrelated to the debt at issue. The government argued that Lane had waived this issue on appeal because before the district court Lane objected to the extrinsic act evidence on the basis that it would portray him as a "deadbeat" and on appeal he argued that the evidence was used to portray him as a

"liar." *Lane*, 323 F.3d at 579. We held in that case that Lane had adequately preserved his claim on appeal. We noted that at trial Lane had made repeated objections to the other debt evidence. We further noted that the government had agreed with the district court that Lane had preserved his objections to the other debt evidence. We held that the government's distinction between a "deadbeat" and a "liar" was de minimis and Lane's objections at the district court sufficiently alerted the court and the government as to the arguments that Lane raised on appeal. *Id*.

This case is distinguishable from the *Lane* case. In *Lane*, the government conceded that the issue was preserved, and the argument that the defendant made on appeal was basically the same as the argument he made below. By contrast, Middlebrook's argument on appeal is completely different from the argument he raised at sentencing below. He advances a different theory for excluding the promissory note from the sentencing calculation. We conclude that Middlebrook forfeited his sentencing argument.

Thus, we review the sentencing loss calculation for plain error. *See United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005). It is well established that "the plain error standard allows appellate courts to correct only particularly egregious errors for the purpose of preventing a miscarriage of justice." *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002) (citing *Lieberman v. Washington*, 128 F.3d 1085, 1095 (7th Cir. 1997)). Even if there has been plain error, we will not reverse unless the error "seriously

affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir. 1998).

In terms of the merits of Middlebrook's argument, Application Note 3(A) to Guideline 2B1.1(b)(1) states that "loss" is the "greater of actual loss or intended loss." We have described the term "loss" as used in the guidelines to be "the value of the property 'taken, damaged, or destroyed,' i.e., the actual loss . . . or the property the defendant intended to take" (the "intended loss"). *United States v. Johnson*, 16 F.3d 166, 170 (7th Cir. 1994). "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense. Application Note 3(A)(i) to USSG § 2B1.1. "Intended loss" is "the pecuniary harm that was intended to result from the offense" and it includes "intended pecuniary harm that would have been impossible or unlikely to occur." Application Note 3(A)(ii) to USSG § 2B1.1. In determining the intended loss amount, the district court must consider the defendant's subjective intent. *Johnson*, 16 F.3d at 172. When the intended loss exceeds the actual loss, the district court uses the intended loss in calculating the defendant's sentence. *Id.* at 170.

Middlebrook argues that his fraud caused no actual loss because the shareholder note had no value, and that he did not intend to cause any loss because he knew the shareholder note did not have any value. He relies heavily on *United States v. Berheide*, 421 F.3d 538 (7th Cir. 2005) and *United States v. Fearman*, 297 F.3d 660 (7th Cir. 2002). In *Berheide*, the defendant obtained a $550,000 loan from a

bank, but soon thereafter was unable to pay back the loan. The remaining balance was $521,000. He induced the bank to delay its collection efforts by fraudulently granting the bank a secured interest in property he did not own. The district court found a loss of $521,000, the amount of the outstanding loan at the time of the fraudulent security interest. On appeal, we reversed. We held that the defendant had no actual loss because he did not have any assets to pay back the loan. We also held that the district court improperly calculated intended loss because the defendant did not believe that his assets were of a value anywhere near $521,000. *Berheide*, 421 F.3d at 540-42.

In *Fearman*, a similar fraud case, the district court held that the actual loss was zero, but that there was an intended loss based on the amount that a third party mortgagee was planning to bid for a building. We held that the true measure of intended loss was in the mind of the defendant, and that there was no basis to conclude that the defendant thought the value of the building was more than zero, let alone the amount that the mortgagee intended to bid. Because the defendant knew the building was worthless, the amount the mortgagee would have offered for the building was not the appropriate amount of loss. *Fearman*, 297 F.3d at 661-62.

In this case, the district court included the loss amount from the promissory note in the sentencing calculation because it found that Middlebrook intended that loss. There was ample evidence for the district court to conclude that Middlebrook believed that he had the assets to

pay back the value of the note, and he intended to cause loss to the creditors by concealing the note from them. The note was listed as an asset in the Federal Telecom financial statement provided to a bank two months before the bankruptcy filing. Further, Middlebrook's personal financial statement as of March 31, 2001 stated that he had a net worth of $2,669,255 after taking into account his liability for the shareholder note. And Middlebrook's written objection to the PSR gave reason to believe that as of the filing of the Federal Telecom bankruptcy about five months later, his financial situation had not materially changed. The district court was "only required to make a 'reasonable estimate of the loss.'" *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007) (quoting Application Note 3(C) to USSG § 2B1.1). The district court's decision to include the value of the promissory note in its calculation as intended loss seems reasonable. It certainly does not amount to plain error.

The government also argues that even if the district court agreed with Middlebrook's argument to exclude the note from the loss calculations, the sentence still would have been 32 months. The offense level would have gone from 28 to 26, and this would have reduced the guideline range to 63-78 months. The district court judge stated that he would have imposed the 32 month sentence as a downward deviation even if his calculation was off. This argument also has merit. We need not remand for resentencing.

**B. Restitution**

Middlebrook next challenges the restitution order. In terms of the standard of review, an abuse of discretion standard is appropriate when the appellant raised an objection to the restitution amount at the trial court. *See United States v. McIntosh*, 198 F.3d 995, 1002-03 (7th Cir. 2000). When no objection is raised, the standard is "plain error." *Id.* In setting the restitution, the district court noted that Middlebrook challenged the amount of restitution. Based on this objection, we review the restitution order for abuse of discretion. We "will disturb a restitution order only if the district court relied upon inappropriate factors when it exercised its discretion or failed to use any discretion at all." *United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005).

Middlebrook argues that restitution should be reduced from $1,590,190 to $9,688, the amount of the insurance refund check. He states that in this case, "the district court made no assessment of actual loss" related to the shareholder note or the distributions at issue. Middlebrook continues that the values of the shareholder note and the undisclosed distributions do not represent actual loss because they were worthless at the time of the bankruptcy filing, as he did not have adequate assets to repay those moneys to the corporation's creditors. Therefore, he claims, the $9,688 figure represents the only harm actually caused by the bankruptcy fraud.

We recognize that "[u]nlike a determination of the amount of loss for sentencing purposes, which can include the amount that the defendant placed at risk, a

restitution order compensates a victim only for losses it has incurred." *United States v. Swanson*, 394 F.3d 520, 527 (7th Cir. 2005) (internal citations omitted). Accordingly, "an order of restitution that exceeds the victim's actual losses or damages is an illegal sentence." *United States v. Webber*, 536 F.3d 584 (7th Cir. 2008) (quoting *United States v. Wolf*, 90 F.3d 191, 194 n.2 (7th Cir. 1996)).

We acknowledge that the sentencing transcript reveals that the district court only referred to Middlebrook's "intended loss" when it calculated the sentencing guidelines range. Yet, the court did not rely on or even reference that earlier calculation when determining restitution. Rather, the record reflects that the court adopted what appears to be the government's actual loss calculation in setting restitution. In determining restitution, the court asked the government for clarification as to the proper amount; the government explained how it calculated "the loss"; and the court accepted that calculation as the basis for its restitution order.

We cannot hold that the court abused its discretion in adopting the government's proposed restitution figure. As we noted above, contrary to Middlebrook's assertions the record reflects that Middlebrook had significant assets around the time of the bankruptcy filing. The district court had ample evidence to conclude that Middlebrook was able to repay Federal Telecom's creditors for the shareholder note and the undisclosed distributions. Thus, the creditors actually suffered $1,590,190 in pecuniary harm resulting from the offenses of conviction, and this harm was reasonably foreseeable.

The court did not rely on inappropriate factors in setting the restitution amount. Far from an abuse of discretion, the court's restitution order seems proper.

### III. Conclusion

Accordingly, we AFFIRM the calculation of loss for the sentencing guidelines, and we AFFIRM the restitution order.