In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2119

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDRE PATTERSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:12-cr-00003 — **Sarah Evans Barker**, *Judge.*

ARGUED APRIL 20, 2017 — DECIDED SEPTEMBER 18, 2017

Before MANION and ROVNER, *Circuit Judges*, and
COLEMAN, *District Judge*.*

COLEMAN, *District Judge.* Andre Patterson was indicted in
2012 on a number of charges arising from his role in a con-
spiracy to rob a fictitious drug "stash house." Following
lengthy delays resulting from a determination that Patterson

---

*Of the Northern District of Illinois, sitting by designation.

was not competent to proceed and subsequent efforts to re-store Patterson to competency, a jury trial was held in September 2015. Out of the five counts involving him, Patterson was found guilty of conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I) and being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) (Count XV). Patterson was subsequently sentenced to the guideline minimum of 168 months incarceration. Patterson now appeals, asserting that the district court erred in denying his motions to dismiss based on the Speedy Trial Act and his Sixth Amendment speedy trial rights, that the prosecutor improperly bolstered witnesses' credibility during opening and closing arguments, and that the district court erred in conducting his sentencing calculation. We affirm Patterson's conviction, but vacate his sentencing on Count I and remand this case for resentencing.

## I. BACKGROUND

In 2011, law enforcement authorities learned that a "robbery crew" was operating in Bloomington, Indiana. Local law enforcement, in coordination with the Bureau of Alcohol, Tobacco, and Firearms, arranged a sting operation to target that crew through the staged robbery of a nonexistent drug stash house.

A confidential informant arranged a meeting between an undercover agent and Dennis English, who had been identified as part of the robbery crew under investigation. The undercover agent posed as an individual who transported narcotics for drug dealers and who was seeking individuals to rob the stash house where he picked up drug shipments. English agreed to perform the robbery, but explained that he

would need time to gather equipment and other participants.

On November 15, 2011, the undercover agent met with the informant, English, and Andre Patterson in a hotel room at the Bloomington, Indiana Quality Inn. The agent explained to English and Patterson that once a month, he would pick up a shipment of drugs and drive it to Chicago. He told Patterson that the first time he had done this he had picked up "six bricks" of cocaine.[1] Patterson asked the undercover agent what he had picked up last time, and he answered that he had picked up ten bricks of cocaine.

Later in the conversation, the agent went on to state that "last month I picked up ten and … there's at least twenty on that table. Like when I get my ten, there's at least that much there too. I aint never been–I don't know if they got more shit in the back or not or what … ."

Patterson responded that "That cash is in the back … . I want that cash. I don't even want the dope. I want that fucking cash." The agent replied that he did not think there was any cash there, but Patterson insisted that there was cash hidden in the house that he had never visited. Patterson continued to repeatedly assert his belief that they would recover large amounts of cash, notwithstanding the agent's attempts to discourage that belief. At one point, Patterson noted that he wasn't "really big on drugs anyway" but was "all about that cash."

---

[1] It appears to be undisputed that "brick" and "key" are slang for a kilogram of narcotics.

English hypothesized that there might be cash in the house that was delivered by a separate courier. When the informant said that this sounded like wishful thinking, English asked the agent and the informant to hypothesize how much money the drug dealers would have to have in order to have "twenty keys," a rented house, and four people being paid to do their "dirty work" at the house. English brought up the twenty kilogram figure again while talking about the individual in the back room, predicting that "[h]e's shooting through the wall. It's twenty bricks. It's his ass if he shows up empty handed, bro. He's got something stupid, bro. I wouldn't even have one key and only have a 9."[2]

English subsequently met with the informant, the undercover agent, and other coconspirators on several occasions in November and early December. On the date of the robbery, English informed the agent that Patterson would be carrying English's .22 pistol for the robbery and that English would be carrying Patterson's 9mm pistol. The robbery participants met at a parking lot and traveled to a storage facility in Bloomington, where police stopped the car Patterson was in and took him into custody. In the car, police found a loaded 9mm handgun with Patterson's fingerprints on it.

A criminal complaint was filed against Patterson on December 16, 2011. An indictment was subsequently filed on January 11, 2012. The trial date for the case was originally set for February 27, 2012, but was subsequently continued to April 30, 2012 on Patterson's motion. On February 24, 2012, Patterson filed a motion for a psychiatric examination to determine his competency to stand trial and at the time of the

---

[2] In context, it is clear that "9" is a reference to a 9 millimeter handgun.

offence, which the Court granted on March 19. Based on other motions filed by Patterson's codefendants, the trial date was rescheduled to July 23, 2012. On April 30, 2012, the Court received Patterson's psychiatric evaluation, which diagnosed Patterson with a delusional disorder and determined that he was not competent to proceed to trial. On May 4, 2012, the parties filed a joint motion for Patterson to undergo a mental evaluation at the Bureau of Prisons, which was granted on May 25th.

On June 19, Patterson was transferred to the Chicago Metropolitan Correctional Center (MCC) for a second psychiatric evaluation. That evaluation, which was received by the Court on September 5th, confirmed the conclusions of the earlier report. Accordingly, on September 14, 2012 the Court held that Patterson was incompetent to stand trial and remanded him to federal custody for hospitalization and treatment. Patterson was initially transferred to a state facility in Henderson, Kentucky, from where he was to be transferred to FMC Butner to undergo psychiatric treatment. Patterson, however, was not transferred from the state facility to FMC Butner until March 21, 2013. Once Patterson arrived at FMC Butner, he was subject to an initial evaluation period that lasted until July 18, 2013. On August 9, 2013, Patterson's forensic evaluation was received by the Court. The evaluation diagnosed Patterson with a delusional disorder and an opioid use disorder and recommended treatment with psychotropic medications. Because Patterson refused to voluntarily accept treatment, the evaluation also requested that the court grant permission to involuntarily medicate Patterson.

The court accordingly held a *Sell* hearing in October 2013. At that hearing, Patterson orally asserted that his due pro-

cess rights had been violated by, among other things, the delays in bringing his case to trial. Following the hearing, the district court ordered that Patterson be involuntarily medicated. Patterson appealed that ruling, and the court's order was stayed pending the resolution of the appeal.

During the pendency of that appeal, Patterson filed a November 14, 2013, motion to dismiss under the Sixth Amendment and the Speedy Trial Act based on the duration of Patterson's competency evaluation, the delays in transporting Patterson to FMC Butner, and FMC Butner's delay between authoring its report on July 19, 2013 and subsequently signing it on August 9, 2013. The Court, however, found that none of the periods in question were chargeable under the Speedy Trial Act and that Patterson had not established a violation of his Sixth Amendment right to a speedy trial.

During the pendency of Patterson's appeal his mental health improved, and his appeal was therefore remanded so that he could receive an additional evaluation from FMC Butner. That evaluation was drafted on October 9, 2014, signed November 6, 2014, and received by the trial court on November 26, 2014. The report concluded that Patterson was competent to stand trial. Patterson subsequently filed multiple motions to continue, which resulted in the trial date being extended from January 20, 2015 until September 1, 2015. Prior to trial, Patterson filed a supplemental motion to dismiss premised on the delay between the drafting of his 2014 forensic evaluation report and his own motion for a continuance after the Court had set the case for trial. The trial court, however, held that many of these delays were not chargeable under the Speedy Trial Act and that Patterson therefore was

still well within the Act's 70-day threshold. The trial court also held that the delays that Patterson identified did not alter that court's prior Sixth Amendment analysis.

Patterson's trial began on September 1, 2015. During its opening statement, the prosecution repeatedly characterized the investigation that resulted in Patterson's arrest as "good" or "excellent" police work. The prosecution also opined on it being "really difficult" to be a police officer, although that comment was part of a larger argument focusing on the preventative nature of the investigation in this case.

The prosecution returned to this line of argument again in its closing rebuttal, repeatedly characterizing evidence as having been recovered through the "good work of police" and describing the agents who testified at trial as "good law enforcement agents."

On September 2, 2015 the jury returned its verdict, finding Patterson guilty of conspiracy to possess with intent to distribute five or more kilograms of cocaine (Count I) and of being a felon in possession of a firearm (Count XV).

At sentencing, the Court calculated that Patterson had a base offense level of 32 pursuant to USSG § 2D1.1(c)(4), which provides for a base offense level of 32 when a drug crime involves between 15 kilograms and 50 kilograms of cocaine. Given Patterson's criminal history category of IV, the court calculated his guidelines range to be 168 months to 210 months of incarceration. The court ultimately sentenced Patterson to the guidelines minimum sentence of 168 months incarceration on Count 1, to run concurrently with a 120 month sentence on Count 15.

Patterson subsequently filed the present appeal challenging the district court's denials of his motions to dismiss, alleged prosecutorial misconduct at trial, and the district court's calculation of his base offense level for sentencing purposes.

## II. DISCUSSION

### A. The Speedy Trial Act

On appeal, Patterson argues that the district court erred in denying his motions to dismiss based on the Speedy Trial Act. Review of a district court's denial of a motion to dismiss under the Speedy Trial Act is de novo.

The Speedy Trial Act mandates that criminal trials commence within 70 days of the issuance of an indictment or a defendant's first appearance before a judicial officer, whichever occurs later. 18 U.S.C. § 3161(c)(1). If the defendant is not brought to trial within 70 days, the defendant may move to dismiss the indictment or information. 18 U.S.C. § 3162(a)(2). The Act, however, excludes certain periods of time from the 70-day clock in order to provide the flexibility to accommodate necessary pretrial proceedings that result in justifiable delays. *See* 18 U.S.C. § 3161(h)(1)–(8). In a case with multiple defendants, any excludable delay attributable to one defendant is excludable as to his co-defendants. *United States v. Mustread*, 42 F.3d 1097, 1106 (7th Cir. 1994).

Patterson first argues that the district court erred by excluding sixteen of the twenty-six days between May 24, 2012—when he was ordered to be committed to a Bureau of Prisons (BOP) facility for a competency evaluation—and his ultimate arrival at the Chicago MCC on June 19, 2012. Patterson contends that this extended delay in his transportation

was presumptively unreasonable and not excludable pursuant to 18 U.S.C. § 3161 (h)(1)(F).

Patterson's argument, however, overlooks the fact that the period in question had already been excluded by court order. On April 17, 2012, Patterson's codefendant filed a motion to continue the trial date, in response to which Patterson filed a "notice of no objection." On April 19, 2012, the Court granted that motion and set the trial for July 23, 2012. The Court specifically held that, in order to permit the defendants reasonable time to effectively prepare for trial, "the period of delay from the date of this Order through and including July 23 ,2012 shall be excluded in computing the time within which the trial of this action must commence." Patterson does not challenge the district court's determination that the ends of justice warranted this delay, and therefore effectively concedes that the period between May 24 and June 19 was excludable in its entirety pursuant to 18 U.S.C. § 3161 (h)(3)(7)(A). *Mustread*, 42 F.3d at 1106.

Patterson next asserts that the sizeable delay between September 14, 2012—when Patterson was remanded to federal custody for treatment—and March 21, 2013—when Patterson arrived at FMC Butner—is chargeable to the government. This argument again rests on section 3161(h)(1)(F), which provides that delays resulting from transportation are only excluded for the first ten days, after which point the time for transportation is presumed to be unreasonable.

Patterson's argument, however, overlooks 18 U.S.C. § 3161(h)(4), which excuses "any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial." Here, it is undisputed that Patterson was incompetent for the entire period between the

court order directing that he be transported to FMC Butner and his arrival at FMC Butner. Moreover, the trial court's orders continuing the trial date throughout that time period all expressly noted that time was excluded with respect to Patterson pursuant to 18 U.S.C. § 3161(h)(4).

Although Patterson argues that delays in transporting a defendant to a competency examination are governed by 18 U.S.C. § 3161(h)(1)(F) rather than 18 U.S.C. § 3161(h)(1)(A)—which excludes the time consumed in conducting a competency evaluation—he makes no similar argument with respect to the interaction between 18 U.S.C. § 3161(h)(1)(F) and 18 U.S.C. § 3161(h)(4). *Cf. United States v. Pendleton*, 665 F. App'x 836, 839 (11th Cir. 2016) ("[I]f a defendant is mentally incompetent under § 3161(h)(4), that time is excludable even if there is also a transportation delay that is unreasonably long and thus not excludable under § 3161(h)(1)(F)."); *United States v. Romero*, 833 F.3d 1151, 1155 (9th Cir. 2016) (holding that the presumption that delays in transportation in excess of ten days are unreasonable under section 3161(h)(1)(F) does not apply when time is already excluded under section 3161(h)(4)). Accordingly, the period between September 14, 2012 and March 21, 2013 was properly excluded pursuant to 18 U.S.C. § 3161(h)(4).

Finally, Patterson asserts that the district court erred in excluding the 28 days between October 9, 2014 and November 6, 2014. Dr. Riley completed her evaluation report of Patterson on October 9, 2014, but did not sign the report until November 6, 2014. Ordinarily, delays "resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant" are automatically excluded. 18 U.S.C. § 3161(h)(1)(A). Patter-

son, however, contends that the delay here does not constitute a proceeding or examination to determine Patterson's competency because Patterson had already been examined, the report had already been completed, and all that was required was the signature of the author.

Patterson's argument begs the question, though he does not raise it, of when the period of excluded time under section 3161(h)(1)(A) ends. Although this Court has yet to squarely address this question, those circuits that have considered it have uniformly concluded that the period excluded under section 3161(h)(1)(A) runs, at minimum, from the filing of the defendant's motion for a competency evaluation through the date of the competency hearing. *United States v. Graves*, 722 F.3d 544, 548 (3rd Cir. 2013) (recognizing that the time excluded under section 3161(h)(1)(A) continues "at least until a competency hearing is held"); *United States v. Stephens*, 489 F.3d 647, 653 (5th Cir. 2007) (affirming the district court's determination that a defendant's motion for a competency evaluation "stopped the clock from the date it was filed" "through the date the court ruled that [the defendant] was competent to stand trial"); *United States v. Vasquez*, 918 F.2d 329, 333 (2d Cir. 1990) ("Since the delays here complained of by [the defendant] arose from proceedings to determine his competency and were prior to the conclusion of the hearing thereon, they must be excluded from the calculation of the speedy trial clock whether or not they are reasonable."). The delay in signing the evaluation here occurred prior to Patterson's acceptance of the evaluation results (which eliminated the need for a competency hearing), and therefore was properly excluded pursuant to 18 U.S.C. § 3161(h)(1)(A).

We hold that all of the periods of time challenged by Patterson were properly excluded pursuant to the Speedy Trial Act, and that the district court therefore did not err in denying Patterson's motions to dismiss on Speedy Trial Act grounds.

**B. Sixth Amendment Speedy Trial Rights**

Patterson also contends that the district court erred in denying his motions to dismiss because he was deprived of his Sixth Amendment right to a speedy trial. We review the district court's denial of Patterson's Sixth Amendment speedy trial claim de novo and review the district court's factual findings for clear error. *United States v. Arceo*, 535 F.3d 679, 684 (7th Cir. 2008).

In order to determine whether a defendant has been deprived of his speedy trial right, we assess whether the delay before trial was uncommonly long, whether the government or the criminal defendant bears more of the blame for that delay, whether the defendant asserted his right to a speedy trial in due course, and the extent of prejudice that the defendant suffered as a result of the delay. *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

The first factor, the length of the delay, acts as a triggering mechanism; we only conduct a full analysis of all of the factors if a presumptively prejudicial amount of time elapsed in the district court. *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007). Here, the parties agree that the length of delay in this instance is sufficient to trigger examination of the other three factors.

The second factor that this court must consider is the reason for the delay. Pretrial delays are often inevitable and justifiable, and different weights are therefore given to different causes of delay. *United States v. Hills*, 618 F.3d 619, 629 (7th Cir. 2010). Deliberate delays are weighted heavily against the government, while more neutral reasons for delay such as negligence or overcrowded courts are weighted less heavily against the government. *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

Patterson contends that the delays resulting from his transportation to his competency evaluation and FMC Butner are attributable to the government. He also contends that Butner unnecessarily delayed his treatment by waiting four months to perform his initial evaluation and by delaying the signature and submission of multiple reports to the district court by a month or more.

These delays, however, receive minimal weight because there is nothing to suggest that they resulted from anything more than institutional or bureaucratic negligence. *See United States v. Vasquez*, 918 F.2d 329, 338 (2nd Cir. 1990) (recognizing that delays in conducting the defendant's competency examination at FMC Butner resulted from "institutional dysfunction" rather than deliberate wrongdoing or bad faith). The district court expressly found as such, and Patterson has offered neither argument nor evidence capable of establishing that the district court's finding constituted clear error.

The delays, moreover, are partially offset by the almost two years during which Patterson was challenging his competency, was incompetent, or was appealing the district court's decision regarding forced medication. *See United States v. Loud Hawk*, 474 U.S. 302, 3016, 106 S.Ct. 648, 88

L.Ed.2d 640 (1986) ("A defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial."); *Danks v. Davis*, 355 F.3d 1005, 1009 (7th Cir. 2004) (recognizing that delay due to a defendant's incompetence cannot be attributed to the state). Relatively equal portions of the lengthy delay in this case are attributable—albeit minimally—to each side. Accordingly, the reasons for the delays in this case weigh in neither party's favor.

The third factor that this Court must consider is whether Patterson asserted his right to a speedy trial in due course. Patterson filed his first motion to dismiss asserting his speedy trial rights on November 14, 2013, after his *Sell* hearing and after the majority of the delays that Patterson contends violated his speedy trial rights had occurred. Patterson's second, supplemental motion to dismiss was filed on July 31, 2015, well after all of the delays at issue here had occurred. Even if this Court were to take Patterson's statement at his *Sell* hearing to be an assertion of his speedy trial rights, that statement also came after most of the complained of delays had already occurred. Accordingly, Patterson's belated assertions of his speedy trial right does not weigh strongly in his favor. *United States v. White*, 443 F.3d 582, 591 (7th Cir. 2006).

Finally, we consider whether Patterson has been prejudiced as a result of the delays in this case. Prejudice to the defendant is assessed in light of the interests which the speedy trial right was designed to protect, including preventing oppressive pretrial incarceration, minimizing the anxiety and concern of the accused, and limiting the possibility that the defense will be impaired by the delay. *Baker*,

407 U.S. at 532. Of these factors, the last is given the most weight. *Id.*

Patterson contends that he was prejudiced because the delay in this case diminished the ability of the law enforcement witnesses to recall the events in question. Patterson offers no specific evidence of such prejudice, but instead relies on the generalized presumption of evidentiary prejudice that results from such lengthy pretrial delays. *See generally Doggett v. United States*, 505 U.S. 647, 657, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Presumed evidentiary prejudice, however, is entitled to lesser weight than prejudice supported by tangible impairments to the defense. *United States v. Saenz*, 623 F.3d 461, 465 (7th Cir. 2010). This is especially the case here, given that the most compelling evidence against Patterson was physical evidence, including the recording of the hotel room conversation and the firearm with Patterson's fingerprints on it.

Similarly, Patterson only argues that his extended detention caused generalized anxiety and concern resulting from his lengthy pretrial incarceration and his detention outside Indiana, which separated him from his family. These concerns, although legitimate, do not tip the scale in Patterson's favor. *See United States v. Ward*, 211 F.3d 356, 361 (7th Cir. 2000) (recognizing that general allegations of anxiety and concern were insufficient to support finding a Sixth Amendment violation).

Although the pretrial delay in this case was lengthy, it was primarily caused by factors outside the government's control. The delay in this case, moreover, was not substantially prejudicial to Patterson given the nature of the evidence against him. Finally, Patterson failed to object to these

delays until after they had predominantly been resolved. Weighing the four factors, we therefore hold that Patterson's Sixth Amendment right to a speedy trial was not violated.

### C. Prosecutorial Misconduct

Patterson next contends that his conviction should be reversed because of prosecutorial misconduct during opening and closing arguments. Ordinarily, when reviewing a claim of prosecutorial misconduct we first determine whether the prosecutor's conduct was improper and, if it was, evaluate the conduct in light of the entire record in order to determine whether it deprived the defendant of a fair trial. *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016).

Here, however, Patterson concedes that he did not object to the prosecutor's statements and that his claim of prosecutorial misconduct is therefore only reviewed for plain error. In order to establish plain error, a defendant must show the existence of (1) an error, (2) that was plain, clear, or obvious, (3) that affected the defendant's substantial rights such that he probably would not have otherwise been convicted; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Tucker*, 714 F.3d 1006, 1011 (7th Cir. 2013).

Patterson contends that the prosecution, through its opening statement and closing rebuttal, improperly vouched for the credibility of the witnesses. A prosecutor improperly vouches for the credibility of a witness when she expresses a personal belief about the truthfulness of the witness or when she implies that facts not before the jury lend that witness credibility. *Flournoy*, 842 F.3d at 529.

In each of the cases in which this court has found improper vouching, there has been a "direct and cognizable link" between the prosecutor's comments and a witness's credibility. *United States v. Elem*, 269 F.3d 877, 883 (7th Cir. 2001). The cases that Patterson relies on all involve such a link. *See, e.g., United States v. Aguilar*, 645 F.3d 319, 324 (5th Cir. 2011) (concluding that a statement suggesting that law enforcement officers were subjected to unfair treatment when they "come into the courtroom and [are] called a liar" constituted prosecutorial misconduct); *United States v. Spain* 536 F.2d 170, 176 (7th Cir. 1976) (holding that a statement that "[a]gents of the federal government do not make those kind (sic) of cases unless, in fact, there is evidence" was grossly improper).

The statements in question here, however, do not reflect on the credibility of an individual witness or a class of witnesses but instead on the execution of the investigation as a whole. Indeed, Patterson himself argues that these statements were improper because they attempted to legitimize the investigative methods used in this case.

Commentary on the quality of an investigation, however, is a proper ground for argument because the rigor of an investigation is reflected by the evidence and therefore is a proper subject for the jury to consider. *See United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir. 1978) ("[W]hether the agents did a good or bad job was a proper subject for argument."). Just as Patterson was free to challenge the government's investigative methods, which he did, the government was free to respond by characterizing its investigation as "good police work." Patterson has accordingly failed to establish the existence of a legal error, let alone plain error.

### D. Drug Quantity Calculation at Sentencing

Finally, Patterson contends that the district court erred at sentencing when it calculated his base offense level based on a determination that Patterson reasonably foresaw that the stash house robbery would yield fifteen to fifty kilograms of cocaine.

A district court's calculation of drug quantity is a factual determination and is therefore reviewed for clear error. *United States v. Clark*, 538 F.3d 803, 812 (7th Cir. 2008). It is the government's responsibility at sentencing to prove the quantity of drugs attributable to a defendant by a preponderance of the evidence.[3] *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008). Because Patterson did not object to the drug amount calculation in the district court, we review this issue for plain error. Under this standard, we will correct only particularly egregious errors that seriously affect the fairness, integrity, or public reputation of the judicial proceeding. *United States v. Middlebrook*, 553 F.3d 572, 577 (7th Cir. 2009).

The only evidence directly establishing how much cocaine Patterson might have anticipated would be at the stash house is the recording of the November 15, 2011, meeting at the Quality Inn. In that meeting the undercover agent initially stated that on his first trip he had picked up six kilograms of cocaine. Patterson then asked the undercover agent how many "bricks" he had picked up last time, and was told that the agent had picked up ten kilograms of cocaine. The un-

---

[3] We are always mindful that, because the stash house in this case is a fiction created by the government, the quantity of drugs is also a fiction born from the imagination of the prosecutor and law enforcement agents.

dercover agent subsequently expanded on that statement, adding that when he had picked up his ten there had been another ten kilograms of cocaine on the table. English subsequently brought up this new twenty kilogram figure while hypothesizing about whether cash might be recovered or what kinds of security to expect. Patterson, however, never acknowledged any of the figures that the undercover agent provided or that English repeated, although his comments made clear his intent to obtain a portion of the cocaine recovered as his compensation for the robbery.

As we have previously held, because of the importance of the drug quantity to calculating the sentence in a narcotics case, district courts must make an explicit finding as to the drug quantity and offense level supporting the sentence. *United States v. Wagner*, 996 F.2d 906, 913 (7th Cir. 1993). In making such a determination, the sentencing court is required to "state reasons why each individual defendant was aware of or reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supportive evidence." *United States v. Goines*, 988 F.2d 750, 775 (7th Cir. 1993).

Here, the sentencing court did not make an express finding of drug quantity or explain the reasoning behind that quantity at the sentencing hearing. Instead, the court appears to have adopted the calculation set forth in the Presentence Investigation Report (PSR). *See United States v. Ali*, 619 F.3d 713, 719 (7th Cir. 2010) (recognizing that district courts are entitled to rely on undisputed portions of a PSR as findings of fact at sentencing). The PSR, however, altogether fails to set forth a specific drug quantity attributable to Patterson or to explain the factual basis for that quantity. Instead, it

concludes, without analysis or discussion, that Patterson has a base offense level of 32, based on an offense involving at least 15 kilograms but less than 50 kilograms of cocaine. The district court's reliance on the PSR was accordingly incapable of fulfilling the Court's obligation to make a specific finding as to drug quantity. *Cf. United States v. Leichtnam*, 948 F.2d 370, 382 (7th Cir. 1991) (recognizing that a PSR that did not contain a conclusion as to the drug quantity attributable to the defendant was incapable of sufficiently explaining the defendant's sentence).

The district court's failure to make or adopt an explicit factual finding as to the amount of drugs attributable to Patterson prior to sentencing constitutes plain error that calls into question the fairness and integrity of Patterson's sentence. *United States v. Hawk*, 434 F.3d 959, 963 (7th Cir. 2006). This is especially the case here because, based on our review, there is reason to question whether the drug quantity that the district court appears to have relied on was reasonably attributable to Patterson.[4] Without a specific finding as to the drug quantity, however, we cannot fairly assess the district court's conclusion on that issue or subject it to meaningful appellate review.

Patterson's sentence on Count I accordingly must be vacated, and this case remanded so that Patterson may be re-

---

[4] It appears that Patterson was sentenced based on the highest and most optimistic of the three drug quantities that the undercover agent set forth. There is some ambiguity, however, as to which of the drug quantities Patterson reasonably anticipated recovering during the planned robbery, especially in light of Patterson's mental health at the time of the offense.

sentenced. *United States v. Leichtnam*, 948 F.2d 370, 382 (7th Cir. 1991).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Patterson's conviction but **VACATE** the sentence on Count One and **REMAND** this case for resentencing.