In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-2400

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARTHUR J. SIMMONS, a/k/a
ARTHUR J. SIMS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 06 CR 85—**Philip P. Simon**, *Judge.*

ARGUED JANUARY 13, 2009—DECIDED SEPTEMBER 18, 2009

Before BAUER, POSNER and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.*   A jury convicted defendant-
appellant Arthur J. Sims[*] of distributing heroin, possessing

---

[*] We are using the name under which the defendant was
indicted and tried. At sentencing, Sims indicated that his actual
name was Arthur J. Simmons, and that is the name under which
(continued...)

heroin with the intent to distribute, possessing a firearm after previously having been convicted of a felony, and possessing a firearm in furtherance of a drug trafficking offense. The district court ordered him to serve a prison term of 106 months. Sims appeals, and we affirm his convictions and sentence.

## I.

The Gary, Indiana residence of Arthur Sims had long been known as a source of heroin. People flocked to the house from far and wide to buy heroin, and although local police had interdicted "quite a number of" those individuals, R. 108 at 25, Sims himself was never caught in the act of selling heroin. Detective Mike Smith would later testify that members of the Gary police department had tried for "quite a long time" without success to gain access to Sims's residence in order to make a controlled purchase of heroin from him. R. 108 at 25. Their

---

* (...continued)

judgment was entered and which is used by the Bureau of Prisons. Nonetheless, in its appellate brief, the government insists that Sims is the defendant's true name. Sims's own attorney, on the final day of trial, asked the court to have the name Simmons stricken from the jury instructions and the verdict form, a request that the district court granted based on the lack of evidence that the defendant had ever used that name. R. 80 vol. 3 at 32. Without attempting to resolve the ongoing dispute as to the defendant's legal name, we shall simply refer him by the name used for the bulk of the proceedings below.

luck finally changed in 2006, when they enlisted Theresa Barnes, a confidential informant who had bought heroin from Sims in the past, to make a series of four controlled purchases from Sims.

These transactions took place on March 14, March 16, March 21, and March 25, 2006. In each instance, a detective drove Barnes to Sims's neighborhood in Gary, and after being dropped off several blocks away, Barnes walked to Sims's residence at 2472 Adams Street. Once admitted to the residence, she made a purchase of heroin from Sims with money (in the range of $20 to $40) supplied to her by the police. Barnes's garments were searched by the police immediately before and after each transaction in order to confirm that she was carrying no contraband other than the heroin that she had purchased from Sims. Barnes wore a concealed "button-hole" camera which recorded her meetings with Sims on both video and audio. These recordings would later be played for the jury at Sims's trial. The recordings showed Sims preparing and packaging the heroin in the living room of the house and captured the conversation that occurred between Barnes and Sims.

Shortly after the last of the four purchases took place on March 25, police officers executed a search warrant at Sims's residence. Inside the home, they discovered Sims, three other men, and Dorothy Davis. Davis, it turned out, had been selling heroin for Sims for at least two years. (She was initially charged as Sims's co-defendant and would plead guilty to possessing heroin with the intent to distribute.)

Evidence of Sims's heroin trafficking was found in the living room of the home. There were two couches in that room along with a chair, a lamp, and a white plate that Sims used to mix the heroin with a cutting agent; all of this was visible on the videos that Barnes had recorded in the course of her controlled buys from Sims. On one of the two couches, where Sims had sat during his transactions with Barnes, the police found plastic baggies, aluminum foil, a bag containing heroin, and a pile of cash totaling $569. Officers would later find some of the marked bills given to Barnes earlier that day amongst that cash. Beneath a cushion on the other couch, the officers discovered a loaded Smith & Wesson 9-millimeter handgun and another $5,120 in cash. A matching gun case and additional ammunition were found across the room on a television stand. The gun had been purchased by an individual who was incarcerated as of the date of the search.

Although Sims was not the record owner of the house at 2472 Adams Street (assessor's office records indicated that Sims's sister held title to the house), ample evidence tied him to that residence. Sims's driver's license listed a different address as his residence, but investigation revealed that Sims was not living at the other address at the time of his arrest. Moreover, a 2004 service invoice and Money Gram receipt found inside of the car Sims was using—which was parked outside of the Adams residence on the day of his arrest—listed 2472 Adams as Sims's address. Finally, and most obviously, the Adams residence was the locus of his heroin sales and was where Barnes had conducted each of the four controlled purchases from Sims.

In a superseding indictment, a grand jury charged Sims with four counts of knowingly and intentionally distributing heroin, in violation of 21 U.S.C. § 841(a)(1) (based on the four controlled buys by Barnes);[1] one count of possessing heroin with the intent to distribute, also in violation of section 841(a)(1) (based on the heroin found in Sims's possession on the day of his arrest); two counts of possessing a weapon and ammunition after a prior felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and one count of possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c). Sims pleaded not guilty to the charges and was tried before a jury. Barnes had died in the interim between Sims's arrest in March 2006 and his trial in August 2007 and thus was not a witness against him. Over Sims's objection, the recordings of the four controlled purchases of heroin that Barnes had made from Sims were admitted into evidence and played for the jury.[2] Detective Smith authenticated the recordings and identified both Sims and Barnes. After

---

[1] A fifth distribution count, based on a controlled purchase made by Barnes after Sims was arrested and then released on bond by a state court, was dismissed at the government's request.

[2] Each recording commenced with Barnes walking from the point where she had been dropped off by the police to the house at 2472 Adams Street and ended with Barnes leaving the residence on her way to rejoin the police. When those portions of the tapes were played, the audio volume was lowered so that the jury could not hear any statements that Barnes may have made outside of Sims's presence.

each tape was played, the district court instructed the jury that they were to consider Barnes's statements for no purpose other than to place Sims's own statements into context. R. 80 vol. 1 at 202, 219; *id.* vol. 2 at 227-28.[3] At the conclusion of the three-day trial, the jury convicted Sims on all of the charges.

In calculating Sims's sentencing range, the district court held Sims to account not only for the amounts of heroin that he had sold to Barnes[4] plus those which were found either in his possession or Davis's at the time of his arrest—a total of 5.79 grams—but for an additional 73.42-gram amount corresponding to the cash found in the living room of the Adams Street residence on the date of his arrest. Sims did not object to converting the $569 found on *top* of the couch into a corresponding amount of heroin (nor to some $360 found on Davis's person) and adding that to the drug quantity, but he did object to the conversion of the $5,120 in cash found *underneath* a couch cushion. His counsel argued that it was unrea-

---

[3] No instruction was given immediately after the March 16 videotape was played; instead, after the March 21 videotape was played a short while later, the court gave a cautionary instruction referring to "both of those two videos that we have just seen[.]" R. 80 vol. 1 at 219. No objection was made to the giving of a single limiting instruction for both tapes, and in view of the fact that the tapes were played within a few moments of one another, any error in this respect was surely harmless.

[4] The amounts sold to Barnes included the fifth transaction that Barnes conducted with Sims after he was arrested and then released on bond. *See* n.1, *supra*.

sonable to assume that all of that money was the fruit of Sims's heroin sales. But after hearing additional testimony from Detective Smith as to the extent of Sims's drug trafficking, the court found it reasonable to conclude that all of the cash found in Sims's possession in fact derived from the sale of heroin. The court noted that Sims had not held a (legitimate) job since 1973, had made multiple controlled sales of heroin to the confidential informant, had been identified as a supplier of heroin by Davis and other individuals, and had a longstanding reputation in Gary as a heroin dealer. R. 108 at 42-43.

The court ordered Sims to serve a prison term of 106 months, which was in the middle of the range called for by the Sentencing Guidelines. In his sentencing memorandum, Sims's counsel asked the court to impose a sentence below that range, and at the sentencing hearing counsel cited as grounds for a sentence below or at the low end of the range Sims's age (fifty-nine) and his health, which counsel said was compromised by a bleeding problem that Sims had only disclosed to him on the day of sentencing. The court found that neither ground warranted a below-Guidelines sentence, commenting that it had been "presented with nothing more than . . . a rather elliptical proffer" in regard to Sims's health, and that in view of the "overwhelming evidence of a drum beat of drug dealing" on Sims's part, his age was not a sufficient reason to reduce his sentence. R. 108 at 53.

## II.

A.  Denial of Request for New Appointed Counsel

Sims first challenges the denial of his request that the court appoint him a different attorney, which he made at the beginning of the trial. He contends that his request was timely, and that in view of the disagreements and lack of communication between himself and the attorney that he wished to replace, the denial of his motion left him unable to present a defense. We review the court's ruling for abuse of discretion. *E.g.*, *United States v. Harris*, 394 F.3d 543, 551-52 (7th Cir. 2005).

We find no abuse of discretion in the denial of Sims's request. The district court addressed his motion in a manner fully consistent with the three-part inquiry set forth in cases such as *United States v. Van Waeyenberghe*, 481 F.3d 951, 959 (7th Cir.), *cert. denied*, 128 S. Ct. 277 (2007). First, the court heard Sims out on the reasons why he was asking for a new attorney. Second, the court took into account the timeliness of his request. And third, after hearing from both Sims and his counsel as to their interactions in preparation for the trial, the court considered whether a complete breakdown in communication had occurred that would prevent Sims from presenting an adequate defense. The court was eminently reasonable in concluding that the motion was untimely, given that it was not made until the morning of trial and Sims had made no prior complaints about

his counsel's performance.[5] Although Sims complained
that his attorney had not spent adequate time with
him in preparing the defense case for trial, after hearing
the multiple meetings that counsel described, the court
reasonably concluded that the complaint lacked merit.
Further, in view of the fact that Sims and his counsel
had met on no less than three occasions in the week
before trial, the court reasonably determined that there
had not been a breakdown in communication between
the two that would stand in the way of Sims's defense.
The court believed that Sims's motion constituted
nothing more than a delay tactic, and the evidence sup-
ports that determination. Finally, Sims has made no
showing that he was prejudiced by the denial of his
motion, i.e., that he was denied the effective assistance
of trial counsel. *See id.*

## B.  Admission of Video Recordings of Controlled Buys

Sims contends that the admission of the video
recordings of the four meetings in which Barnes made

---

[5] Sims contends that he had aired his dissatisfaction with
counsel previously, when he was arraigned on the superseding
indictment. The transcript of that arraignment has not been
included in the record. In any case, the district court still
was within its rights to conclude that the request for a new
attorney was untimely, given that the arraignment on the
superseding indictment (which dropped Davis as a co-
defendant in the wake of her guilty plea) took place just ten
days prior to trial.

controlled purchases of heroin from him violated his rights under the Sixth Amendment's Confrontation Clause. Sims concedes that his own statements on the recordings were admissible. Fed. R. Evid. 801(d)(2)(A); *e.g.*, *United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006). But he contends that Barnes's statements were not. Barnes, of course, had died before trial and could not be cross-examined. Sims contests the district court's determination that her statements were admissible to place Sims's remarks in context. *See id.* at 666 ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth."); *see also United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009). He insists that "there was no context needed for the non-testimonial statements and therefore any statement of the declarant (the confidential informant, Barnes) was testimonial and subject to the Confrontation Clause." Sims Brief at 10.

The videos were properly admitted. Barnes' statements on the videos were not offered for their truth and were not testimonial as Sims contends. They were properly admitted to place Sims's statements in context, *see United States v. James*, 487 F.3d 518, 524 (7th Cir. 2007) (coll. cases), and we have no reason to question the court's judgment that it would be helpful for the jury to have that context as opposed to hearing only one half of conversations that were two-sided. The district court prudently allowed the jury to hear only those statements that Barnes made while in Sims's presence. The jury heard nothing that Sims might have said to herself or to

the police during her approach to or departure from the residence on any of the four occasions. Moreover, the court properly instructed the jury that Barnes's statements were not to be considered for their truth but rather solely for the context they provided for Sims's statements. *See United States v. McClain*, 934 F.2d 822, 832 (7th Cir. 1991).

## C.  Sufficiency of Evidence that Sims Possessed Firearm Found in Couch

Sims contends that the government did not prove beyond a reasonable doubt that he possessed the gun found under the seat cushion of a couch in the living room of the residence where he conducted his business with Barnes. Although none of the videos showed Sims handling the gun, it was discovered in a location within arm's reach of where Sims was seen packaging heroin on the videos. But in view of evidence that the house at 2472 Adams Street was not in his name but the name of his sister, and in view of the additional fact that his driver's license reflected a different address, Sims contends that the evidence raised insurmountable doubt about whether he possessed the weapon or the home's registered owner did. Of course, we are obliged to view the evidence in a light most favorable to the government, and we will reverse the conviction for insufficiency of the evidence only if no reasonable factfinder could find beyond a reasonable doubt that Sims possessed the weapon. *E.g., United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008).

The evidence was more than adequate to support the jury's finding that the weapon was within Sims's dominion and control. *See id.* Although Sims's name was not on the title to the residence and his driver's license bore a different address, those facts by no means foreclosed the possibility that he possessed the weapon found in that residence. All four videos showed him packaging and distributing heroin in the living room of 2472 Adams Street, sitting on a couch within arm's reach of where the gun was stuffed under the cushion of an adjacent sofa. Moreover, a service invoice and a Money Gram receipt found in his car showed his address as 2472 Adams. In view of that evidence, the jury could reasonably conclude that Sims in fact lived at the Adams address and could reasonably find beyond a reasonable doubt that he possessed the gun found in the living room sofa at that address. *See United States v. Seymour*, 519 F.3d 700, 715 (7th Cir.), *cert. denied*, 129 S. Ct. 527 (2008); *United States v. Castillo*, 406 F.3d 806, 812-13 (7th Cir. 2005).

D.  Sufficiency of Identification of Defendant on Videos

We may make short work of Sims's contention that the evidence is "ambiguous" as to whether he is the person captured on video distributing heroin to Barnes. Sims Brief 13. The jury was perfectly able to compare the videos with Sims's visage, and it obviously concluded that he was the person seen in the videos. The district judge himself had no doubt that it was Sims, remarking at sentencing that Sims was "seen on the videotape dis-

tributing drugs in these controlled purchases to the confidential informant." R. 108 at 42. Sims had also been photographed outside of the Adams Street residence while it was being searched, and that photograph was identified by Detective Smith and admitted into evidence. Smith himself formally identified Sims as the person he and his fellow officers had arrested at 2472 Adams on March 25, 2006, as did Detectives Jolly and Martens, who had participated in the search of the residence.

E.  Conversion of Cash Found in Sims's Possession into Heroin

Sims next contends that his Guidelines offense level and sentencing range were the product of an inappropriately high drug quantity. The district court, as we noted earlier, held him responsible not only for the amounts of heroin that he sold to Barnes in the four controlled buys and that were found in his possession (and that of Davis) at the time of his arrest, but an additional amount corresponding to the total of $6,139 in cash found in his residence (less $20 in controlled buy money that Barnes had given Sims for the fourth purchase of heroin on the day of his arrest). Sims contends that it was unreasonable for the court to assume that all of the cash found in the house, and in particular the $5,120 found underneath the sofa cushion in the living room, was the product of heroin sales. The district court's drug quantity determination is a finding of fact that we review for clear error. *E.g.*, *United States v. Longstreet*, 567 F.3d 911, 924 (7th Cir. 2009).

The court did not err, clearly or otherwise, in converting all of the cash discovered in the living room into a corresponding amount of heroin and adding that to the total drug quantity for which Sims was accountable. When there is a sufficient basis to believe that cash found in a defendant's possession was derived from drug sales, a court properly includes the drug equivalent of that cash in the drug-quantity calculation. *United States v. Rivera*, 6 F.3d 431, 446 (7th Cir. 1993). Sims himself concedes that the cash found on top of the sofa was properly found to be the fruit of heroin sales, and there was more than sufficient evidence to support the same finding as to the cash found underneath the sofa cushion. Both quantities of cash were found in or on the living room couches (along with a variety of drug-related paraphernalia) where Sims prepared and packaged the heroin and conducted his sales. Detective Smith's testimony established that Sims had a longstanding reputation as a heroin trafficker, and Sims had apparently held no other job since the 1970s. Dorothy Davis, according to Smith, had been dealing heroin on Sims's behalf for at least two years. There was no hint that Sims's sales were situational or isolated. To the contrary, the evidence reflected, in the district court's words, a persistent "drum beat of drug dealing" that had gone on for years if not decades. R. 108 at 53. If anything, Sims is fortunate that he was not held to account for a much greater quantity of heroin.

F. Reasonableness of the sentence

Finally, Sims contends that his sentence is unreasonable. The 106-month sentence that the district court imposed was within the range advised by the Sentencing Guidelines. Nonetheless, Sims contends that the sentence is excessive in view of his age and failing health.

Sims has not rebutted the presumption of reasonableness that we apply to his within-Guidelines sentence. *See Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2462-63 (2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Given Sims's lengthy history of heroin trafficking, a substantial sentence was called for both to account for the gravity of his crimes and to protect the community. 18 U.S.C. § 3553(a)(2)(A) & (C). The fact that Smith was middle-aged by the time he was convicted and sentenced did not by itself support a sentence below the Guidelines range. And whatever Smith's physical ailments may have been, because Sims had not disclosed them to his counsel until the day of sentencing, his counsel was unable to make a record of such ailments sufficient to warrant more serious consideration.[6] The sentencing transcript makes plain that the district court understood its discretion to impose a sentence outside of the advisory Guidelines range, attached no presumption of reasonableness to that range,

---

[6] The presentence report otherwise disclosed that Sims suffered from high blood pressure, for which he was not taking medication, and had a heroin addiction, for which he had never before sought treatment. PSR ¶¶ 65, 67.

and considered the sentencing factors set forth in section 3553(a). The sentence it imposed was a reasonable one.

## III.

We find no error in Sims's trial or sentencing that warrants reversal. We therefore AFFIRM his convictions and sentence. The motion that Sims's appellate counsel has filed pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967), to withdraw from representing Sims is DENIED as moot.