In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1346

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DERRICK R. CLINTON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-cr-00058-RTR-1 — **Rudolph T. Randa**, *Judge.*

ARGUED NOVEMBER 30, 2015 — DECIDED JUNE 16, 2016

Before ROVNER and WILLIAMS, *Circuit Judges*, and SHAH, *District Judge.*[*]

ROVNER, *Circuit Judge.* On March 11, 2014, a grand jury returned a two-count indictment against Derrick Clinton, charging him with possession of a firearm as a convicted felon

---

[*] Hon. Manish S. Shah of the Northern District of Illinois, sitting by designation.

in violation of 18 U.S.C. § 922(g), and possession with intent to distribute a mixture and substance containing cocaine base in the form of crack cocaine in violation of 21 U.S.C. § 841(a)(1). Pursuant to a plea agreement with the government, Clinton entered a plea of guilty to the felon-in-possession count, and the government agreed to dismiss the second count and to recommend a sentence within the advisory guidelines range. The district court ultimately sentenced Clinton to a term of imprisonment of 76 months followed by three years of supervised release and a $100 special assessment. Clinton now appeals that sentence.

The arrest in this case stemmed from a domestic violence call received by the Milwaukee police on January 9, 2014. When the officers responded to the residence, they spoke with the victim M.K., who informed them that Derrick Clinton sold cocaine and had a firearm in the residence. She told the officers that Clinton kept the firearm in the bedroom closet, but that she had retrieved it and hidden it under a pile of clothes in the dining room so that Clinton could not use it. The officers conducted a search of the residence with M.K.'s consent, and the officers found a Lorcin 9mm pistol under the clothes in the dining room. Underneath the couch in the living room the officers discovered a plate containing 2.29 grams of cocaine base, a razor blade, a box of baggies, and a digital scale. The following day, Clinton called a Milwaukee police officer and admitted to possessing the gun. He stated that he purchased the gun from a drug addict. He was arrested on January 21, 2014, and subsequently admitted that he owned the firearm and that he cooked and sold crack cocaine.

Prior to sentencing, the Probation Office prepared a Presentence Investigation Report (PSR) that determined a base offense level of 24 pursuant to U.S.S.G. § 2K2.1(a)(2) based on his two prior felony controlled-substances convictions. The PSR further recommended that the district court apply a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) because Clinton had possessed the 9mm weapon "in connection with another felony offense"—the drug offense. The PSR also advocated a three-level decrease for Clinton's acceptance of responsibility, resulting in a total offense level of 25. In conjunction with his undisputed Category III criminal history, the PSR determined a Guidelines range of 70-87 months, and the district court sentenced him to 76 months. Clinton now challenges that sentence, arguing that the district court erred in applying the four-level enhancement under § 2K2.1(b)(6)(B), failed to consider mitigating circumstances, and relied on improper factors in determining his sentence.

We review a district court's sentencing procedures and questions of law involving the interpretations of the Guidelines de novo. *United States v. Schmitt*, 770 F.3d 524, 538 (7th Cir. 2014). "'[W]here the district court bases the application of a sentencing guideline on factual findings, we review for clear error.'" *United States v. Meece*, 580 F.3d 616, 620 (7th Cir. 2009), quoting *United States v. Wagner*, 467 F.3d 1085, 1089 (7th Cir. 2006). Clinton first argues that the district court erred in applying the four-level enhancement under § 2K2.1(b)(6)(B). A district court's application of those Guidelines is a mixed question of law and fact, and is reviewed for clear error. *Schmitt*, 770 F.3d at 538-39. Section 2K2.1(b)(6)(B) provides for a four-level enhancement if the defendant "used or possessed

any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Only the first of those two provisions is applicable in this case. Application Note 14 to that section provides that subsection (b)(6)(B) applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense."

As we recognized in *United States v. Harper*, 766 F.3d 741, 747 (7th Cir. 2014), the broad language of § 2K2.1 presents a danger of sweeping within its reach wide-ranging offenses that may be only tenuously connected to the offense of conviction. Courts have responded to that potential for abuse by requiring that the other offense must fall within relevant conduct in order for the enhancement to apply, and the Sentencing Commission has followed suit in an amendment effective November 1, 2014 which clarifies that courts must consider the relationship between the offense of conviction and the other offense consistent with relevant conduct principles.

In this case, the defendant may be found to have used a firearm in connection with another felony offense if he "'used or possessed' the firearm in connection with (1) his general drug dealing activities in his home or (2) the purchase of the firearm, which he allegedly bought with drugs." *Schmitt*, 770 F.3d at 539.

The district court began by relying on the second of those two approaches. In considering whether the four-level enhancement was proper, the district court first stated that a "solid presumption" exists that "where you have drugs you

have guns and usually violence." The district court then found that "in any event, you have the defendant purchasing a gun from a drug [dealer.][1] Sure, the inference could be drawn or the argument can be made that it was purchased from the sale of the drugs that he was making, but you've got an exchange here for guns and drugs if you accept that as true." We have held that the § 2K2.1(b)(6)(B) enhancement is proper when the defendant has engaged in an exchange of drugs for a weapon. *Schmitt*, 770 F.3d at 539. Accordingly, the district court's finding, if proper, would support the application of that enhancement.

That finding, however, is not supported in the record, and the government to its credit acknowledges as much. The underlying discovery and the factual proffer in Clinton's plea agreement establish only that the person from whom he purchased the weapon was a drug addict. Although it is possible that the person could have conveyed the firearm to Clinton in exchange for drugs, there is no evidence of that, and mere speculation is insufficient to support a four-level enhancement. *United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010) (due process requires that sentencing determinations be based on reliable evidence rather than speculation or unfounded allegations). Therefore, the district court's reliance on the drugs-for-guns scenario in applying the enhancement was reversible error.

---

[1] The transcript says "drug clear" instead of "drug dealer" but the government acknowledges that was likely a typographical error and that the PSR-writer and judge seem to have concluded that the seller of the weapon was a drug dealer.

In addition to finding that Clinton exchanged drugs for the weapon, the court also considered whether the firearm was used or possessed in connection with drug dealing in the residence. The court noted that the need to protect drugs is paramount, "especially if you are living in an area where this is an activity that occurs on a daily basis," and that "you can't engage in that type of activity and not think that you're not in need of some form of protection." The court then concluded: "that supports … the presumption—the rebuttable presumption for sure that the proximity of this gun in the house was used for a secondary felony."

That analysis lacks the findings that would support application of the enhancement. The enhancement is proper under § 2K2.1(b)(6)(B) if the court determines that the defendant used or possessed the firearm in connection with another felony offense. Application Note 14 to that section provides that "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia … application of [subsection] (b)(6)(B) … is warranted because the presence of the firearm has the potential of facilitating another felony offense." That presumptive determination reflects the axiom that guns are indeed a routine part of the drug trade and facilitate that trade by providing protection from the theft of drugs or the cash proceeds of drug sales, as well as a deterrent to those who would compete in that drug trade. If a firearm is found in close proximity to the drugs or its paraphernalia, the conclusion that the firearm is connected to that drug activity is a reasonable one in light of the common use for that purpose. See *United States v. LePage*, 477 F.3d 485, 489 (7th Cir. 2007).

But that Application Note should not be interpreted to ordain such a connection whenever a defendant involved in drug distribution also is in possession of a firearm. The term "close proximity" must not be read out of the Application Note. It is the close proximity that allows the court to find such a connection without any further evidence—the proximity alone provides the evidence that the two are connected. If that "close proximity" is lacking, then the connection may still be established, but it must be determined through evidence of such a connection.

The government, citing *United States v. Meece*, 580 F.3d 616, 621 (7th Cir. 2009), argues that it may not be necessary that a weapon be found in precisely the same location in a residence in order for the court to find that it was in "close proximity." In *Meece*, two handguns were recovered under the mattress of Meece's bed, and in addition the search of the residence found a scale, several plastic baggies, and a Tupperware bowl—all containing cocaine residue—in the kitchen, and $3,400 in cash hidden in the basement rafters. Therefore, paraphernalia and possible proceeds of the drug trade were found in various locations on multiple levels of the house. We noted that the seizure of a firearm in close proximity to illegal drugs is powerful support for the inference that the firearm was used in connection with the drug trafficking operation, and we considered Meece's argument that the guns were not in close proximity to the drug paraphernalia and that the enhancement therefore did not apply. *Id.* We were unpersuaded by that argument. The district court had concluded that Meece was trafficking drugs and that the guns were in the house to protect against the increased risk of home invasion occasioned by that

drug trafficking. *Id.* We held that the evidence was capable of multiple inferences, and the district court's interpretation was not erroneous. *Id.* In so holding, we noted that the bedroom was a logical place to store guns if the purpose was to protect against the increased risk of home invasion. We did not hold that the guns were located in close proximity to the drug paraphernalia triggering the enhancement, nor did we identify any district court holding to that effect. Instead, we merely addressed Meece's argument that the guns were not in close proximity, and held that the district court could nevertheless properly find that the guns were present in the house to protect against the increased risks associated with drug trafficking. In *Meece*, we were presented with significant evidence supporting such a finding, including the drug paraphernalia and cash proceeds distributed through different levels of the house, the amount of cash on hand in the home, and the location of the guns under the mattress where they would be easily accessible in the event of a nighttime home invasion.

In the present case, we have essentially no fact findings at all by the district court relevant to this issue. The court did not find that the firearm was readily accessible in the bedroom closet, that drugs were kept in that closet or even the bedroom, or that significant amounts of drugs or cash were kept at the home that presented a need for protection on that basis. Those are indicative of the types of factual findings that can support the enhancement. See, e.g, *United States v. Sewell*, 780 F.3d 839, 848-49 (7th Cir. 2015) (noting that the district court in applying an enhancement for possessing a firearm in connection with drug dealing, made the relevant finding of fact: that the gun

was found under the defendant's side of the bed and was loaded, and that in that location the gun was readily accessible to the defendant and capable of being fired instantly). Although the court concluded that there was a rebuttable presumption "that the proximity of this gun in the house was used for a secondary felony," the court never discussed the proximity of the firearm to the drugs in so concluding. The court discussed only the inherent dangers in the drug trade, and the need for protection that often accompanies it. That evidence is relevant to determining whether a connection may exist sufficient to support the enhancement, but it does not support the determination that the rebuttable presumption based on close proximity is applicable.

The government, with laudable candor, acknowledges that the propriety of the enhancement in this case is a close call. We agree that the evidence supporting such an enhancement here is sparse. As stated, the court has identified no evidence that the firearm was in "close proximity" to the drugs, such that the proximity alone could trigger the enhancement. The evidence indicated that the firearm was kept in the closet in the bedroom, and there was no evidence that any drugs or drug paraphernalia were found in that closet or even in the rest of the bedroom. The only drug evidence was found under the couch in the living room. The proximity of the weapon to the drugs therefore was not "close" such that the distance alone warranted the enhancement.

There was also little evidence regarding his drug trafficking activities that would support a determination that the firearm facilitated or had the potential to facilitate the drug offense. In many cases regarding drug trafficking, the amount of drugs

and/or cash on the premises increases the likelihood that a firearm on the premises is connected to protection for that activity. In this case, the evidence is atypical. The only evidence of drug distribution occurring on the premises comes from a statement by Clinton himself in an interview with a Milwaukee police officer. The officer asked him how often he sells drugs out of the house, and Clinton responded "Um, not too often. Ah, just have a few people being we, like the regulars I've been doing since maybe—it's only been about two or three people. The kids can even tell you that." That evidence indicates that the drug distribution from the residence was limited to sales to two or three individuals who had been regulars for some time. Moreover, there is no evidence indicating that a significant amount of drugs were processed through the residence. The amount found in the residence was only 2.29 grams of cocaine base, which the defendant's brief characterizes as an amount worth approximately $200. See generally *United States v. Atkins*, ___ Fed.Appx. ___, 2016 WL 1077819 at *1-2 (informant testifying that 2 grams of crack cocaine cost $200). With the evidence indicating only a small-scale drug operation with sales in the residence restricted to a few trusted regulars, there is little basis to connect the firearm to the drug offense. Rather than indicating a need for protection from unscrupulous drug buyers, the evidence indicates that Clinton sold to only trusted buyers in the residence. And there is no evidence that he kept a sufficient amount of drugs or cash at the residence to support an inference that the firearm on the premises facilitated, or had the potential of facilitating, another felony offense. Finally, there is no direct evidence of a connection, such as evidence that he was seen in possession of the firearm during drug

transactions, or that he purchased the firearm or retained it in connection with the drug activity.

The record thus provides little support for such an enhancement. We do not hold that the enhancement is inapplicable as a matter of law, but the fact findings in this record do not support the enhancement. The district court identified only the generalized need for protection by those engaged in drug offenses. But that would apply whenever a person who sold drugs also possessed a firearm in the residence. It would transform the "close proximity" test of Application Note 14 to a broad-based rebuttable presumption that the enhancement applied whenever a firearm was possessed and a drug offense was also alleged regardless of the location of the firearm and its proximity to the drugs. The Sentencing Commission could have imposed an enhancement if any weapon was possessed without requiring that it be possessed in connection with the offense, but it chose not to do so. See *United States v. Carillo-Ayala*, 713 F.3d 82, 89-90 (11th Cir. 2013)(comparing the provision in § 2D1.1(b)(1) requiring only that a weapon was possessed with the requirement under § 5C1.2(a)(2) that the firearm was possessed in connection with the offense). Because the court's findings are insufficient to support application of the four-level enhancement, that determination is vacated and the case must be remanded for resentencing.

Because we are remanding on the enhancement issue, we address only briefly Clinton's other challenges to his sentence. First, Clinton argues that the court erred in failing to address his health problems as a mitigating circumstance that warranted a sentence below the Guidelines range. Although a district court may properly remain silent regarding frivolous

arguments for leniency, "where a defendant presents an argument that is 'not so weak as not to merit discussion,' a court is required to explain its reason for rejecting that argument." *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008), quoting *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007). On appeal, Clinton argues that the district court erred in failing to address his health problems identified in the PSR, but Clinton never sets forth any details as to those health problems nor does he present any argument as to how those problems should impact his sentence. In fact, one has to read the PSR or the government's brief to even realize that the significant health issue is Type 2 diabetes and complications from it. We have recognized that serious health ailments may militate in favor of a lower sentence, and specifically have remanded for a district court to consider a defendant's diabetes which resulted in serious health issues. *United States v. Harris*, 567 F.3d 846, 855 (7th Cir. 2009). In this appeal, however, Clinton has failed to discuss his health condition at all, instead choosing to simply reference the PSR as setting forth that information. That cursory discussion of the issue is insufficient to properly present it on appeal. Nevertheless, because this case is being remanded for resentencing, we note that severe health conditions may indeed be a militating circumstance that the court should consider in conducting the § 3553(a) analysis, and unless the argument is clearly without merit the court should address it in determining the appropriate sentence.

Finally, Clinton asserts that the district court improperly considered extraneous factors that veered far beyond the § 3553(a) factors. Specifically, the district court lamented the adverse impact the drug trade has had in Mexico and Latin

America which supply the drugs, and referenced the kidnapping and murder of 23 school children by Mexican drug gangs. The court then concluded that Clinton's participation in that type of enterprise is a very serious offense. Clinton argues that the court erred in linking his offense to the kidnapping and murder of school children in Mexico because there is no indication in the record that Clinton is in any way connected to a Mexican drug cartel, let alone involved in narco-terrorism, kidnapping, or murder. Clinton also argues that the court veered beyond the proper bounds of sentencing in its statements as to his character in response to his claim that he is not a bad person. The district court judge questioned that, stating that "you just told me you're a good man and made some mistakes. But you're not, you're a bad man. And I'll tell you how simple this is. Good men do good things, bad men do bad things. Dealing drugs is a bad thing; ergo, therefore, you're a bad man. Simple as that." We have cautioned against a focus on such extraneous factors in past cases. In *United States v. Figueroa*, 622 F.3d 739, 743-44 (7th Cir. 2010), we addressed a similar "odd focus on nation-states and national characteristics," where the district court linked the drug trade to Mexico, then to Colombia and Venezuela, and then to Iranian terrorists through the person of then-Venezuelan President Hugo Chávez. In combination with other improper statements, we held that the litany of inflammatory remarks undermined anything else the court said during the hearing, and we had no way of discerning how, if at all, those extraneous considerations influenced the sentence. *Id.* at 744.

Similarly, in *United States v. Webster*, 528 Fed.Appx. 648, 651 (7th Cir. 2013), we addressed remarks by the district court that

people are basically "decent" or "indecent," which mirror the remarks in this case that there are "good people" and "bad people." In that case, we held that those remarks alone fell short of the litany of inflammatory remarks that would undermine the court's explanation for the sentence. *Id.* at 652. Therefore, we have repeatedly identified such remarks as straying beyond the proper § 3553(a) analysis whether or not the remarks required that the sentence be vacated. Because we are remanding on other grounds, we need not determine whether or not the remarks in this case would alone require that the sentence be vacated. We simply note the potential for such remarks to derail the sentencing hearing and require a subsequent remand for resentencing, so that the court can avoid that prospect in this resentencing.

The sentence is VACATED and the case REMANDED for resentencing consistent with this opinion.