In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2658

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHNNY JONES,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District Indiana, South Bend Division.
No. 3:16-cr-00080-JD-MGG-3 — **Jon E. DeGuilio**, *Judge.*

ARGUED FEBRUARY 16, 2018 — DECIDED AUGUST 14, 2018

Before WOOD, *Chief Judge,* and KANNE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* After a jury convicted Johnny Jones of possessing and conspiring to distribute methamphetamine, the district court sentenced him to a term of imprisonment of 145 months. In calculating Jones' sentence, the district court considered Jones' possession of a gun carried in the purse of his co-conspirator and also several quantities of methamphetamine for which Jones claimed he was not responsible. We

have reviewed these findings by the district court for clear error and finding none, we affirm.

## I.

In February or March 2016, Jones and his girlfriend, Jennai Rowland, moved to Benton Harbor, Michigan, staying in various hotels and, on occasion, with Jones' cousin, Stephanie Smith.[1] Jones and Rowland used Smith's address as their own. Hard times had befallen Smith and she joined with Jones and Rowland to sell drugs, particularly methamphetamine. Smith's role was to find buyers and connect them to Jones and Rowland. Jones and Rowland controlled the business. They set the prices, authorized transactions, and provided instructions for meeting—communicating with Smith by way of text messages or in person. When Smith found a buyer, she would contact Jones or Rowland, and then obtain the methamphetamine from Rowland. Sometimes Jones would be present at these transactions and give the go-ahead for the sale; sometimes Rowland would arrive alone. After selling the methamphetamine, Smith would give the buyers' money to Rowland or Jones. When Smith needed to earn more money, she would send a text message to Jones' phone asking that he send more customers her way.

From May 2 through August 8, 2016, an undercover police officer purchased approximately 60 grams of methampheta-

---

[1] We recite the facts in the light most favorable to the jury verdict, *Common v. City of Chicago*, 661 F.3d 940, 945 (7th Cir. 2011), but we note later which facts Jones disputes for purposes of sentencing, and which the judge found by a preponderance of the evidence, rather than the jury's finding beyond a reasonable doubt.

mine from Smith over the course of six controlled buys. (A single "dose" of methamphetamine is usually about a half of a gram). For each transaction, Smith would contact Rowland and Jones and obtain the drugs from them.

The conspiracy unraveled on August 30, 2016, after a final controlled buy. On that day, Smith agreed to sell the undercover officer eight ounces (226.8 gm) of methamphetamine at a Walmart parking lot in Niles, Michigan, a few miles north of the Indiana boarder. She arrived with only two ounces (56.7 gm) of methamphetamine, but offered to travel to South Bend for the remaining six ounces.

Smith left the two ounces of methamphetamine with the undercover officer in exchange for $2,000 cash (the serial numbers of which had been pre-recorded by the police). She then drove to South Bend where she met Jones, Rowland, and Jones' mother at a hotel. After Smith explained to Jones and Rowland that she needed more methamphetamine, Jones told Rowland to "[g]et her what she need." R. 185 at 104. The four then walked out of the hotel to a silver Mustang. As they walked out, Jones' mother pointed out that Rowland had a gun hanging out of her purse. Jones was irritated that the gun was not properly concealed and pushed it back down into Rowland's purse.

With Jones present, Rowland gave Smith two more ounces of methamphetamine.[2] Smith gave $1,500 of the undercover officer's money to Jones and he allowed her to keep the

[2] Neither the record nor the briefs explain why Smith, who promised the undercover agent six more ounces of methamphetamine, only received two more ounces from Jones and Rowland.

remaining $500. Smith then returned to the Walmart parking lot where law enforcement officers arrested her.

Meanwhile, investigators followed the silver Mustang to a mall parking lot where it approached a blue Buick, stopping driver's side to driver's side. Investigators followed the car but could not hear the conversation or see anything inside the Mustang, but they could see that someone tossed two baggies containing a golf-ball-sized white substance from the Mustang's driver's side window to the Buick, and someone from the Buick got out of the car and handed a bundle of cash into the Mustang's driver's side window. Immediately after the transaction, investigators stopped the Mustang and arrested Jones, who was driving, and Rowland, the front seat passenger. Jones had $1,500 in pre-recorded money from the undercover agent in his pocket and an additional $2,400 in cash. In a purse that Rowland had on her lap at the time of the stop, investigators found "one fairly small package" of methamphetamine and a loaded .380 caliber pistol. R. 185 at 136, 155–56. Investigators did not find any of Jones' fingerprints on the gun, but did find them on the magazine inside the weapon. They also found a plastic grocery bag in the back seat which contained 53.8 grams of marijuana, two packages of methamphetamine, empty baggies, and a digital scale. They also found another digital scale and two cell phones in the car's center console area. A law enforcement officer testified that the two packages of methamphetamine in the back seat were "substantially larger" than the package in Rowland's purse. R. 185 at 135–37. In all, law enforcement officers recovered three baggies of methamphetamine from the car—one from Rowland's purse and two from the back seat. The three bags contained the following amounts of methamphetamine: 1.6 grams, 15.9 grams and 29.6 grams. Unfortunately the bags

were not marked with the location in which they were found and one was not properly sealed. Nevertheless, given the testimony that the substantially smaller of the bags came from Rowland's purse, there is sufficient evidence for us to conclude (as did the trial court) that the 1.6 gram bag came from Rowland's purse and the 15.9 and 29.6 gram bags came from the rear seat.

One of the cell phones found in the search of the Mustang was linked to the phone number that Smith used to communicate with Jones. This phone was also the phone used in text message exchanges with Rowland's phone, including a message sent on July 26, 2016, from Rowland's phone, which said "Meet the newest member of our family. … " along with a picture of the .380 caliber pistol posed with a bundle of cash. R. 186 at 32.

A grand jury charged Smith, Rowland, and Jones with multiple drug related crimes. Jones' indictment charged him with conspiring to distribute over 50 grams of methamphetamine in violation of 21 U.S.C. § 846; possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). R. 80. Rowland pled guilty to possessing a firearm in furtherance of a drug trafficking crime. Smith pled guilty to conspiring to distribute methamphetamine and agreed to cooperate with the government by testifying at Jones' trial.

At trial, Smith testified that she received the first two ounces of methamphetamine that she sold to the undercover agent on August 30, 2016, from Rowland the night before the sale. She also testified that when she arrived at the hotel to get

the second batch, she explained what she needed to Rowland and Jones, and, in response, Jones told Rowland to give her two additional ounces of methamphetamine. She also witnessed Jones push the gun which was visible in Rowland's purse out of sight and then reprimand Rowland for allowing it to be visible.

At trial, one police officer testified that he recovered the smaller baggie of methamphetamine from Rowland's purse and the two "substantially larger" bags from the Mustang's rear seat. He identified Government Exhibits 21, 22 and 23 as the three recovered bags, but he did not specifically identify for the jury which bag was which. Each evidence bag was marked with a weight—Exhibit 21, 1.6 grams; Exhibit 22, 15.9 grams; Exhibit 23, 29.6 grams. See R. 202-1.[3]

During deliberations, the jury immediately asked a question about the weight of the three exhibits. The judge allowed the jurors to inspect Exhibits 21–23 in the courtroom. A few hours later the jurors returned a verdict convicting Jones of conspiring to distribute over 50 grams of methamphetamine and possessing with intent to distribute methamphetamine. The jury acquitted Jones of possessing a firearm in furtherance of a drug trafficking crime.

Jones waived his right to counsel for sentencing after a breakdown in the attorney-client relationship over strategy. The district court allowed him to represent himself, but

---

[3] None of the trial exhibits were included originally in the record on appeal, but these three were added later. See Appellate Court Record at 21. None of the other trial exhibits were included in the record on appeal. We urge all counsel in all cases to include trial exhibits in the record on appeal to make this court's review of the record more efficient and thorough.

assigned stand-by counsel. The pre-sentence report calculated Jones' base offense level at 26, based on a total amount of methamphetamine estimated at 288.29 grams. This calculation included the following:

| Amount | Event |
|---|---|
| 62 gm | Sold by Smith during controlled transactions, May-August 2016 |
| 111 gm | Delivered by Smith on 8-30-16 at Walmart |
| 47 gm | Found in Mustang upon arrest (including 1.6 gm in purse, 15.9 from rear seat, 29.6 gm from rear seat) |
| 68 gm | Calculated by converting $2400 in cash at an estimated sale price of $1000/ounce |
| **288 gm** | **TOTAL** |

At sentencing, Jones objected to the quantities going back to May 2016 arguing that he was only found guilty of the August 30 incident, and, he asserted, there was no evidence that he was involved with Smith while she was selling to the undercover officer on prior occasions.

The presentence report contained a claim by Jones that he supported himself by selling cars for cash and that the seized cash came from those vehicle sales. When asked about it at sentencing, however, Jones admitted he had no evidence to support the claim. Nor did Jones object to the formula for calculating the conversion ratio and raised no claim at sentencing that his cash came from the marijuana sales. He also

argued, without evidence, that he was not responsible for the methamphetamine in Rowland's purse as it was for her personal use.

The district court rejected Jones' objections, and accepted the calculations from the Walmart transaction, the drugs found in the Mustang (which it aggregated), and the cash conversion, for a finding that Jones was responsible for a little over 288 grams of methamphetamine. The district court specifically accepted Smith's credibility that she received all of her methamphetamine from Jones and/or Rowland and that Jones set the price and paid Smith for her efforts. The judge rejected Jones' claims to the contrary. The court noted that the calculations likely underestimated the breadth of the drug distribution because they did not include drugs distributed without Smith's involvement even though there was evidence that Jones and Rowland distributed methamphetamine without Smith acting as middleman.

As for the firearm enhancement, the presentence report recommended a two-level increase for the use of a dangerous weapon during a drug offense. See U.S.S.G. § 2D1.1(b)(1). Jones objected to the increase, arguing that there was insufficient evidence to find that he had personally possessed the firearm, noting that his fingerprints were found on the magazine, but not on the weapon itself.

The court overruled the objection and applied the enhancement finding that there was sufficient evidence set forth at trial that Rowland possessed the firearm in furtherance of the drug conspiracy. The district court also found that Rowland's possession of the firearm was not only foreseeable to Jones, but that there was evidence that he actually knew about it.

Based on these rulings and Jones' criminal history category of V (Jones had two prior federal convictions, including one prior drug conviction), the district court calculated the Sentencing Guidelines range to be 130–162 months of imprisonment. Jones was subject to a mandatory minimum of ten years based on his prior drug felony conviction. After considering the factors required by § 3553 such as Jones' difficult childhood, his drug addictions, and inability to obtain a social security card and thus a legitimate job, the district court sentenced Jones to a mid-range sentence of 145 months. The judge also noted that even if the court had sustained the objection to the firearm enhancement it still would have imposed the same sentence based on Jones' criminal history and non-compliance with supervision in the past. Jones committed the crimes at issue here while on supervised release.

## II.

### A. Drug quantity calculations

Jones' primary argument on appeal is that the district court miscalculated the drug quantities used to calculate his sentence. On that argument he faces an uphill battle. We review a district court's drug quantity calculations for clear error. *United States v. Patterson*, 872 F.3d 426, 437 (7th Cir. 2017). This means that we uphold the district court's factual findings on these matters unless we have a firm and definite belief that the district court has erred. *United States v. Ranjel*, 872 F.3d 815, 818 (7th Cir. 2017). A district court calculating drug quantities at sentencing need only support its findings by a preponderance of the evidence. *United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015).

The problem for Jones on almost all of his arguments on this matter is the theory of conspirator liability. Under a *Pinkerton* theory of liability, a defendant is liable for the criminal conduct of co-conspirators where those criminal acts "(1) were reasonably foreseeable to the defendants; and (2) occurred during the time that they were members of the conspiracy." *United States v. Conley*, 875 F.3d 391, 401 (7th Cir. 2017) (citing *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946)). Thus, in a drug conspiracy, each conspirator is responsible not only for drug quantities directly attributable to him but also for amounts involved in transactions by co-conspirators that were reasonably foreseeable to him. *United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015).

This means that all of Jones' arguments that try to place the drugs in Rowland's possession, rather than his, are futile provided that her possession of those drugs was foreseeable to Jones and in furtherance of the conspiracy. Even Jones' attempts to claim that the drugs found in Rowland's purse were for her personal use only cannot prevail under a clear error review. A district court calculating drug quantities at sentencing need only support its findings by a preponderance of the evidence "and district courts may make reasonable though imprecise estimates based on information that has indicia of reliability." *Bozovich*, 782 F.3d at 818. Determining drug quantities is not an exact science. *Austin*, 806 F.3d at 431.

At trial, an officer testified that the police found a small bag of methamphetamine in Rowland's purse and two larger bags of methamphetamine in the back seat of the car. Given the quantities of methamphetamine in each bag—1.6 grams, 15.9 grams and 29.6 grams—the district court could certainly put together the officer's testimony and the weights on the

bags to find, by a preponderance of the evidence, that the 1.6 gram bag was in Rowland's purse and the other two bags were in the back seat. The failure to mark the location where each bag was found would not have passed muster if the government had needed to prove quantity beyond a reasonable doubt. Under the burdens associated with calculations at sentencing, however, this was sufficient.

On the day of their arrest, Jones and Rowland had been involved in at least two drug sales—one with Smith and the other with the occupants of a blue Buick. This was not a situation where the police found a different stash of drugs back at Rowland's apartment in her nightstand, for example. The two were driving around together in a car full of drugs, cash, and a weapon. The district court was within its discretion to determine that all of the drugs in and around Jones and Rowland that day were packaged and ready for sale by them in pursuit of their joint venture. Drugs that a defendant obtained for personal use from a supplier can also be part of a common plan or scheme of a conspiracy. See *United States v. Snook*, 60 F.3d 394, 396 (7th Cir. 1995).

In any event, given the other drug quantities, the 1.6 grams found in Rowland's purse would have had no impact on Jones' sentence even if incorrectly attributed to him. Errors in calculating relevant conduct are subject to a harmless error analysis. *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996). Any error here was harmless at worst, as it would not have affected the Guidelines range.

Based on this same theory of conspirator liability, the district court did not err in attributing to Jones, as co-conspirator, all of Smith's sales to the undercover officer. The district court found that Jones and Rowland were a team. They arrived in

Michigan together, lived together, and worked together to distribute methamphetamine. When Rowland obtained a gun, she sent a photograph of it to Jones telling him they had a new "member of the family." Rowland held the drugs and gave them to Smith to sell while Jones set prices, authorized sales, and sometimes came along for the transaction. Smith joined the conspiracy to connect buyers to the drugs. She contacted Jones and Rowland when she needed to procure drugs for specific transactions, and she physically obtained drugs from Rowland, and sometimes from both Rowland and Jones together. She received instructions and authorization from Jones and returned the proceeds to both Jones and Rowland and took a share of the profits for herself with Jones' permission.

The district court was well within its discretion to conclude that Jones, Rowland, and Smith all participated in a conspiracy and therefore to count against Jones the six occasions in which Smith sold methamphetamine to an undercover agent between May and August 2016. The district court found Smith's testimony on all of these facts to be credible, a finding to which we give exceptional deference, overturning only for clear error. *Austin*, 806 F.3d at 431.

The district court's credibility finding also puts to bed Jones' argument that the court erred in attributing the $2,400 in cash to drug sales. "When there is a sufficient basis to believe that cash found in a defendant's possession was derived from drug sales, a court properly includes the drug equivalent of that cash in the drug-quantity calculation." *United States v. Simmons*, 582 F.3d 730, 737 (7th Cir. 2009). While objecting to the amount in the presentence report, Jones made a feeble argument that the cash came from vehicle sales, but he

admitted at sentencing that he had no evidence for that assertion. On appeal, Jones abandons that claim and argues instead that the government failed to establish the required relationship between the transaction and the offense as required by *United States v. Patel*, 131 F.3d 1195, 1203 (7th Cir. 1997). We disagree.

When the police arrested Jones and Rowland, they found $2,400 in Jones' pocket along with the $1,500 from the undercover agent's controlled purchase (the latter of which they could verify by the pre-recorded serial numbers). Immediately after Smith procured more methamphetamine from Jones and Rowland, police officers watched Jones and Rowland drive to a mall parking lot and toss some baggies containing a white substance from their Mustang into the window of a blue Buick. The officers also watched the driver of the blue Buick pass a bundle of cash into the Mustang's driver's side window. The officers testified that, given their experience, they recognized these events to be a drug purchase. Law enforcement officers attempted to stop the Buick, but they lost contact with it and were unable to do so. Of course it would have been better had the police been able to stop the Buick and verify that the people in the car had purchased methamphetamine and note the quantity purchased. And although the investigators testified that they saw white colored baggies pass between the cars, they were also hindered from seeing inside the Mustang because of glare on the window. Nevertheless, determining drug quantities at sentencing is not an exact science and requires only proof by a preponderance of the evidence. *Austin*, 806 F.3d at 431. Of course evidence can always be stronger, but the district court certainly had a sufficient preponderance of evidence to determine that Jones and Rowland had just exchanged a significant

amount of methamphetamine for cash just before being stopped, arrested, and searched. To the extent that Jones argues that the cash could have come from the sale of marijuana, the court was entitled to credit the police testimony that the exchanged baggies contained a white substance (as opposed to green or brown as it might have been in a marijuana sale). This was sufficient under the preponderance standard to link the cash to the drugs such that the district court could convert the $2,400 in currency into a drug quantity. Jones did not object to the court's formula that estimated the sale price at $1000/ounce for a total of 2.4 ounces or 68 grams.

## B. Firearm sentencing enhancement

Jones has no easier of a task arguing that the district court improperly imposed a sentencing enhancement for possession of a firearm in furtherance of the crime under U.S.S.G. § 2D1.1(b)(1). We review this decision for clear error too. *United States v. Morris*, 836 F.3d 868, 872 (7th Cir. 2016).

Jones tries to distance himself from the weapon by saying "I grilled [Rowland] every day to keep a firearm away from me because I did not want firearms around me because I had already been to prison for a firearm." R. 188 at 22. Unfortunately this particular strategy does not work for a criminal involved in a conspiracy. As we have noted, a defendant is liable for the criminal conduct of co-conspirators, including possession of a firearm, where those criminal acts were reasonably foreseeable to the defendants and occurred during the time that they were members of the conspiracy. *Conley*, 875 F.3d at 401 (internal citations omitted). The government need only establish these facts by a preponderance of the evidence. *United States v. Ramirez*, 783 F.3d 687, 690 (7th Cir. 2015).

In this case, the court credited Smith's testimony that, as she was walking with Rowland and Jones at the hotel, Jones noticed the firearm sticking out of Rowland's purse and pushed it back in and then reprimanded her for not doing a better job of hiding it. Once a district court makes a credibility finding, we must defer to it unless we find clear error. *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013). We see no reason to question the credibility determination. The fact that Jones grilled Rowland to "keep a firearm away from me because I did not want firearms around me because I had already been to prison for a firearm," actually supports the conclusion that Jones knew that Rowland was carrying a firearm, as does the text from Rowland to Jones which said, "meet the newest member of our family," and included a picture of a gun. R. 188 at 22; R. 186 at 32. It seems that the only thing that Jones did not know was that he would be culpable for Rowland's possession of the gun whether she kept it away from him or not. He knew she had a gun. He knew she had it when they were at the hotel selling drugs. She carried the loaded gun in her purse while she and Jones received cash and turned over drugs to Smith at the hotel. Then she rode with Jones and a substantial quantity of drugs to a shopping mall while he participated in another drug transaction, all the while with the gun right in her purse on her lap within arm's reach. The purse with the gun was still on her lap when she was arrested. Our court has recognized that, given the dangers of drug trafficking, guns and drugs often go hand in hand. *United States v. Thompson*, 842 F.3d 1002, 1007 (7th Cir. 2016); *United States v. Gulley*, 722 F.3d 901, 909 (7th Cir. 2013). Because Jones knew that Rowland had a gun in her purse while the two were engaged in a drug sale, the court did not err by finding that it was reasonably foreseeable to Jones that

Rowland would possess the gun while furthering their drug trafficking. And because the two were involved in a drug sale together just moments after the gun slipped out of Rowland's purse, there is no doubt that both Jones and Rowland were members of the conspiracy at the time.

Once the government showed by a preponderance of the evidence that Jones possessed the firearm (via co-conspirator liability in this case), the burden shifted to Jones to demonstrate clear improbability that the possession was in connection with the drug offense. *Morris*, 836 F.3d at 872. That he could not do. The gun was present during the actual drug transaction. It was sitting in a purse in the front seat of a car next to a baggie of drugs, and just behind it, in the back seat, was a grocery bag full of methamphetamine, marijuana and digital scales. Given the connection between guns and drugs in the drug trafficking trade, we have held that "[i]f a firearm is found in close proximity to the drugs or its paraphernalia, the conclusion that the firearm is connected to that drug activity is a reasonable one in light of the common use for that purpose." *United States v. Clinton*, 825 F.3d 809, 812 (7th Cir. 2016).

The district court properly calculated the drug quantity and applied the enhancement for possession of a weapon. We AFFIRM the decision of the district court in all respects.